American League Baseball Club of New York,
Plaintiff, *v.* Byron B. Johnson, Individually and
as President of The American League of Profes-
sional Baseball Clubs, and The St. Louis American
League Baseball Company, and the Cleveland Base-
ball Company, Defendants.

(Supreme Court, New York Special Term, October, 1919.)

Contracts — assignment of — breach of — when suspension of
    baseball player in employ of a club which is a member of
    American League of Professional Baseball Clubs interferes
    with his individual contract — associations — injunctions.
Injunctions — when motion for, pendente lite, granted — action
    restraining suspension of a baseball player — associations —
    jurisdiction.

> The suspension of a baseball player in the employ of a
> club which is a member of the American League of Professional
> Baseball Clubs, from participation in the games scheduled by
> the league not only interferes with his individual contract but
> may also interefere with the reputation and collective ability
> of the club of which he is a member.
> The president of said league has no authority to discipline
> the clubs which are members of the league; that power by
> sections 6, 7 and 10 of the constitution of the league is given
> exclusively to its board of directors.
> Under section 36 of said constitution the power to require
> a club to discipline one of its players is lodged in the board of
> directors, the supervisory body of the league, and if the presi-
> dent has any function in connection therewith it is merely to
> transmit complaints to the board.
> Where said president, upon discovering that a club which
> was a member of the league had assigned its contract with a
> certain player to plaintiff, also a member of the league, sent
> a notice to the umpires of the league that because of his
> desertion of his club and breaking of his contract said player
> had been suspended from the league and that he would not be
> permitted to participate in any games scheduled by it until

further notice, the act of the president if construed as a punishment of both clubs, one in assigning its contract with the player and the other in accepting such assignment, was clearly *ultra vires.*

The offense of which the player was accused, desertion and breach of contract, not being embraced within the playing rules, for a violation of which the president was authorized to suspend a player, he had no duty to perform in that connection, and was not required to exercise the power of suspension vested in him by section 20 of the constitution of the league, and his act in suspending the player was unauthorized from the viewpoint of original jurisdiction.

In an action to restrain such suspension of the player it was conceded that plaintiff had primary jurisdiction to discipline him and the president of the league admitted that at the time such suspension was ordered, he made no inquiry as to whether that jurisdiction had been exercised nor did he call upon the player for an explanation of the matters leading up to his suspension. *Held,* that considering the far-reaching effects of the suspension, the loss to plaintiff and its assignor, the confusion of the rights of the clubs and players, and the serious damage that could accrue to property rights, the act of the president complained of was not fortified with that perfect appreciation of the facts which evinces a desire to do equity to all concerned, and a motion for an injunction *pendente lite* will be granted.

Motion for an injunction *pendente lite.*

Fitch & Grant (Davies, Auerbach & Cornell, Joseph S. Auerbach, Charles H. Tuttle and Martin A. Schenck on the brief), for plaintiff.

Powell, Wynne & Roberts (Stephen C. Baldwin, of counsel), for defendants.

Wagner, J. This is a motion for an injunction *pendente lite;* the crucial provision of which would restrain the defendant Johnson from suspending one Carl W. Mays, a baseball player in the employ of the plaintiff, from participating in games scheduled in

the American League of Professional Baseball Clubs. The latter organization is an association composed of the plaintiff, which is a domestic corporation, and seven other clubs. The defendants, the St. Louis American League Baseball Company and the Cleveland Baseball Company, are members of the said association.

It is undisputed, and, indeed, a matter of common knowledge, that the commercialization of baseball is a highly profitable undertaking, rendering lucrative returns to the member clubs, to their stockholders and to their employees. Large capital is invested in the enterprise, and the property representative of this capital consists principally of contracts with individual players, together with the reputation of the club for skill and ability in playing the game. Suspension of a player, therefore, not only interferes with his individual contract but may also interfere with the reputation and collective ability of the club. Inasmuch as the leading clubs of the league and their players are entitled at the end of the season to certain rights and privileges which are unquestionably to be deemed property rights, this interference with an individual player would confuse and possibly destroy the rights of the respective clubs and their players, for the validity of the games in which Mays participated might be questioned.

On July 13, 1919, Mays was in the employ of the Boston Club. In a regularly scheduled game between that club and the Chicago Club on the baseball grounds of the latter at Chicago, Mays was directed to pitch the game for his team. In the very early stages of the contest he played concededly below the standard of skill which he usually exhibited. At this time and for some time prior thereto, Mays had shown a disposition

of discontent and nervousness which he attributed to personal difficulties and the worry incident thereto. On behalf of the defendant it is claimed that his dis-position was one of recalcitrancy and desire to aban-don his contract.

In the last half of the second inning, while Mays occupied the pitcher's position, he was struck by a ball thrown by his catcher with considerable force. Mays and several eye-witnesses of the occurrence aver that the ball struck him in the back of the head and injured him. It is conceded by the defendants that he was struck, but they contend that it was a glancing blow on the shoulder. What happened thereafter is largely in the obscurity of dispute. On behalf of the plaintiff, certain facts are stated with positiveness and precision. On behalf of the defendant, these facts are controverted, but to a great extent by argumenta-tion and inferences exacted from alleged discrepan-cies in the affidavits presented by the plaintiff.

The plaintiff contends that Mays after the incident referred to played but another half inning and then retired to the club house. Barrow, the manager of the Boston Club, immediately sent two players to him to ascertain his condition. The latter reported to Barrow that they found Mays in a condition of great nervous tension, and indeed of practical nervous collapse. Barrow then sent a message to Mays permitting him to retire to his hotel and seek medical attention. Admittedly he was authorized to grant such permis-sion. As heretofore stated, this version of the trans-action is contested by the defendants. They claim that Mays' conduct was unextenuated desertion of the Boston Club.

On July twenty-third, Johnson claims that he sent Barrow a telegram advising the latter that Mays

should be suspended by the Boston Club, but Barrow asserts in his affidavit that he never received such a communication. On that date also Johnson notified plaintiff of the necessity of punishing Mays. On July twenty-sixth, Johnson requested Hildebrand, the umpire officiating at the game, to ascertain the facts, and on July thirtieth, Hildebrand reported on the transaction to the effect that Mays was substantially at fault.

After retiring from the game on July thirteenth, Mays went to his hotel in Chicago and from there left on a train for Boston and from there he says he went on a fishing trip in Pennsylvania to recover, he states, from his nervous collapse. On July twenty-ninth, he reported to Mr. Frazee, the owner of the Boston Club, at New York, in compliance with a communication received from Mr. Frazee on the previous day. Mays told Frazee that he was suffering from a nervous breakdown, that he could be of no service to the Boston Club by reason of his condition, that he desired to take a rest, and that he was ready to report to the Boston Club whenever directed. Frazee and Mays came to an understanding on that same occasion.

If the matter of the alleged dereliction of Mays was solely within the jurisdiction of the Boston Club, the circumstances and result of this interview would operate unquestionably as a condonement of Mays' offense, if he committed any. Frazee assigned the contract between the Boston Club and Mays to the plaintiff. This happened on July twenty-ninth. Johnson says that he first discovered that this transfer had been made on July thirty-first, and immediately on the same day he suspended the player. The order appears in the form of a notice to the umpires of the league, and is as follows: " You are hereby notified

the American League has suspended Carl W. Mays of the Boston Club by reason of his desertion of the club and the breaking of his contract. He will not be permitted to take part in any games until you receive direct notice from me.''

The act of the defendant Johnson, of which complaint is made, is susceptible of a double interpretation. The defendant himself in his examination before trial represented his act as a punishment of the Boston Club and the New York Club. From the general tenor of the defense, however, it would appear that the defendant's act was intended to be a punishment of Mays. If the former construction be accepted, the act was clearly *ultra vires*. Exploring the constitution within its four corners, there is no authority either by express declaration or fair intendment for such an act. The president is given no authority whatever to discipline the clubs which are members of the league. Sections 6, 7 and 10 give such power exclusively to the board of directors. The defendant Johnson declares that his reason for punishing the clubs was not the alleged dereliction of Mays nor the failure of the Boston Club to discipline him therefor, but it was the act of the Boston Club in making the assignment of the contract with him and the act of the New York Club in accepting such assignment. If it be assumed that jurisdiction is vested in the president to discipline the clubs for certain offenses, there can be found in the constitution no provision which would permit punishment for the specific acts complained of. That the transfer of Mays and not the failure to suspend him was the motive for the infliction of the penalty, is evident from the fact that the New York Club at no time had the power to discipline Mays, and in so far as it is concerned, the only reason of complaint is found

in its acceptance of the transfer. The theory that the clubs and not Mays were the object of the president's action, is further fairly deducible from the consideration that Mays was suspended with salary; that he was not the actual sufferer, and that the real sufferer was the New York Club, the party which was guilty of no offense under any construction of the constitution or by-laws, for the New York Club was obliged to pay the salary of Mays while it was deprived of his services.

If, on the other hand, the act of which complaint is made is to be deemed a punishment of Mays, it then becomes necessary to decide whether or not the president had the power to decree such punishment. Assuming that Mays was guilty of a punishable offense, who had original jurisdiction thereover? The defendant Johnson concedes that the right, and indeed the duty, to take cognizance of the offense belonged to the Boston Club. He claims, however, that a similar power was vested in him. If that be the case, such power in him must be either concurrent or supervisory. Section 20 of the constitution provides as follows: " The President in the performance of his duties, shall have the power to impose fines or penalties, in the way of suspension or otherwise, upon any manager or player who, in his opinion, has been guilty of conduct detri· mental to the general welfare of the game."

Section 24 thereof reads as follows: " Each club belonging to this league shall have the right to regulate its own affairs, to establish its own rules, and to discipline, punish, suspend or expel its manager, players or other employees, and these powers shall not be limited to cases of dishonest play or open insubordination, but shall include all questions of carelessness, indifference, or other conduct of the player that may

be regarded by the club as prejudicial to its interest, but not in conflict with any provision of the National Agreement or this Constitution.''

The first quoted section is obviously a general provision relating to the '' general welfare of the game.'' Section 24 is a specific grant of power to the individual clubs. Established rules of construction seem to compel the subordination of the general to the special provision, namely, of section 20 to section 24. The jurisdiction to punish the alleged offense under such a construction would belong to the Boston Club exclusively. On behalf of the defendants, however, it is urged that the last clause of section 24 precludes such a construction and that the authority emanating from section 24 is to be exercised in a manner not in conflict with the rest of the constitution; or, in other words, that the individual club is entitled to regulate its affairs, saving, however, the general rights of the president conferred by section 20. Is there such an intention in the words '' but not in conflict with any provision of the National Agreement or this Constitution? '' What was the intention of the framers of the constitution?

Bacon, in his Abridgment (Statutes 1, 5) speaks as follows: '' In order to form a right judgment whether a case be within the equity of a statute, it is a good way to suppose the law maker present and that you have asked him this question, did you intend to comprehend this case? Then you must give yourself such answer, as you imagine he, being an upright and reasonable man, would have given. If this be that he mean to comprehend it, you may safely hold the case to be within the equity of the statute; for while you do no more than he would have done, you do not act contrary to the statute, but in conformity thereto.''

10

Section 24 of the constitution was adopted in 1910. It was formulated along the lines of section 29 of the constitution then existing and operative in the National League. For all practical purposes, these two constitutions may be considered *in pari materia.* Section 29 of such Constitution reads as follows: " Each club shall have the right to regulate its own affairs except as herein otherwise provided, or as the league may from time to time determine and in doing so shall have the right to establish its own rules and to discipline, punish, suspend or expel its own manager, players or other employes, and these powers shall not be limited to cases of dishonest playing or open insubordination but shall include all questions of gross carelessness, indifference or other conduct of the player that may be regarded by the club as prejudicial to its interest, and not to conflict with any provision of this Constitution or the playing rules of this league."

In *Smith* v. *People,* 47 N. Y. 330, 339, Judge Allen speaks as follows: " One part of an act of the legislature may be referred to in aid of the interpretation of other parts of the same act. So in case of doubt or uncertainty acts *in pari materia,* passed before or after, and whether repealed or unrepealed, may be referred to in order to discern the intent of the legislature in the use of particular terms; and within the same rule, and the reason of it, contemporaneous legislation, although not precisely in *pari materia,* may be referred to for the same purpose."

A comparison of the new section with the old, the arrangement of words, the interdependence of clauses, and the general context, shows that the intention which dictated the old section was identical with the intention which dictated the more recent version. In the old section the clause in dispute clearly did not

relate to the entire preceding context but modified only the provisions within its immediate proximity, or that provision which immediately preceded it. The clause " not in conflict with any provision of the National Agreement or this Constitution " limited the power of the club to make regulations concerning " carelessness, indifference, or other conduct." It did not touch or affect the first part of the section which grants regulatory power in general to the individual clubs; for that grant of power is modified by the clause " except as herein otherwise provided." The last quoted phrase would have been unnecessary and futile if it is held that the first part of the section is affected by the clause " not to conflict with any provision of this Constitution or the playing rules of this league." We should then have unnecessary duplication of expression. The court will not force a construction which would place the framers of the constitution in the position of enacting a meaningless tautology, or a provision which has no vitality because it is redundant. It therefore is a necessary conclusion that under the old section, namely, section 29, an individual club has the power to regulate its own affairs " except as herein otherwise provided," but when the present section 24 was adopted, the framers deliberately omitted from it the general exception " except as herein otherwise provided " which was found in the derivative section.

Here a common rule of construction finds direct application. It has been long established that the conscious omission of a provision in the re-enactment of a statute, or the rewriting of an instrument, must have been done with a purpose in view. The omission in this instance having obliterated from the statute the general saving clause modifying the power of the clubs

to regulate their own affairs, the construction becomes inevitable that it was the intention of the framers to give unmodified and unrestricted power to the clubs in respect to their purely internal affairs.

There is still another aspect of section 20 which is of great weight in determining the jurisdiction of the president. He is given the right to discipline only " in the performance of his duties." Clearly he has no jurisdiction if he is outside the scope of his duties, or if he has no duty to perform in respect to the matter under consideration, for these powers were placed in his hands as instruments to assist him in the performance of his duties and they are to be used for no other purpose. Under the constitution he is charged with appointing, controlling and instructing umpires. Under section 33 of the constitution the president further has jurisdiction to suspend any umpire, manager or player for offering, agreeing, conspiring or attempting to cause any game to result otherwise than on its merits. The constitution is barren of any further grant of power to the president. Under the playing rules, however, adopted pursuant to the national agreement of 1903, the president's powers are more specifically defined. There the umpires appointed pursuant to the constitutional authority vested in the president are authorized to enforce the playing rules, and under rule 67 the president is authorized to suspend a player for violation of these rules. Under these rules it is the right and duty of the president to regulate the actual playing of the game on the field and to enforce the rules instituted for the governing of the game. Doubtless his powers would extend to the discipline of players for any infringement of these rules upon the field or for an overt act committed by a player on the field in viola-

tion of the rules. Beyond that power, however, it does not seem that the president may proceed, for under the constitution he is given power to discipline only in the performance of his duties, and his duties are only such as are set forth in the constitution and playing rules.

The offense of which Mays was accused was obviously not one of those embraced within the prohibition of these rules. It was not an overt act committed on the field. No more conclusive proof of this is required than the recital in the notice of suspension, which declared that the discipline was decreed for desertion and breach of contract. The president having no duty to perform in this connection, it was not required of him to exercise the power of suspension vested in him by section 20 of the constitution. From the viewpoint of original jurisdiction, therefore, it would seem that the president's act in suspending Mays was unauthorized. But if he did not have such original jurisdiction, did he have supervisory or appellate power? In justifying his act the defendant Johnson elects to rely on supervisory jurisdiction, which he claims under the constitution, for he admits that the Boston Club had primary jurisdiction, that he had no right to act until the Boston Club had proceeded, and that then his power to act came into being.

Under section 36 of the constitution, the board of directors of the league is given power to supervise the actions of the different clubs in disciplining or failing to discipline their respective players. The section reads as follows: " The Board shall at once consider any complaint against a manager or a player of another club for conduct in violation of any provision of this Constitution or prejudicial to the good repute of the game of baseball and shall have the power to require

the club to which such player or manager may belong to discipline him, and upon the repetition of such offense to expel him, provided that such complaint be preferred in writing, giving such particulars as may enable the Board to ascertain all the facts, and be transmitted to the President, by whom it shall at once be referred to the Board.''

Under the section just quoted the power to require a club to discipline one of its players is lodged in the board of directors. If the president has any function in connection therewith it is merely the ministerial duty to transmit complaints to the board. If it were intended that the president had the power to compel the clubs to enforce the rules there would be no necessity of providing for the transmission of the complaint to the board. If he had power to decide the matter, why is he required to transmit the complaint to anybody? It may be fairly inferred that the constitutional direction that he transmit the complaint precludes his action upon it. The establishment of the board as the supervisory body of the league by constitutional provision, plainly excludes the implication that the president shall have equal power. " *Expressio unius est exclusio alterius.*" If the foregoing considerations be correct, the president appears to be without authority either original or supervisory to direct the suspension of Mays as ordered in the notice of July thirtieth.

On behalf of the defendant, contention is made that many times in the past the defendant Johnson had exercised power similar to that which he claims the right to exercise under the present circumstances, that his jurisdiction to make orders similar to the one now in dispute has never been questioned, and that the parties to a contract will be bound by the construc-

tion which their conduct and acquiescence have placed upon it. Although courts have placed great weight on the construction which parties have put upon contracts existing between them, such ⸱ considerations must never violate the fundamental concepts of justice. If the original act was unauthorized, repetition does not invest the act with authority. If the construction did not convey power to the president, he cannot prescriptively acquire power by continual usurpation. If the opposite were true he would in effect effectuate an amendment of the constitution by usurpation. In his immortal and always useful farewell address, Washington said: " If in the opinion of the people the distribution or modification of the constitutional powers be in any particular wrong, let it be corrected by an amendment in the way which the Constitution designates, but let there be no change by usurpation."

So in this case, there can be no change by usurpation. The structure of precedents must fall unless laid on the foundation of authority.

It does not appear necessary to pass on the motives which actuated the president in suspending Mays. His act may possibly have been arbitrary. At the time of the suspension his knowledge and information concerning the real facts were imperfect. In his examination he testified that at the time of the sus‧ pension he could not fix any penalty until " I had the facts," and again, " I wanted the facts from Frazee and I wanted the report from Mays." Although conceding that the matter of discipline was primarily upon the Boston Club, he admits that at the time the suspension was ordered he did not inquire whether or not the Boston Club had disciplined the player. Neither did he call the player before him for an explanation.

Supreme Court, October, 1919.    [Vol. 109.

In the light of these facts, and considering the far-reaching effects of the suspension, the loss to the plaintiff and to the Boston Club, the confusion of the rights of the clubs and players, and the serious damage that could accrue to the property rights, the president's act was, to say the least, not fortified with that perfect appreciation of the facts which evinces a desire to do equity to all parties concerned.

The motion for an injunction *pendente lite* is therefore granted, with costs.

Motion granted, with costs.