## MILWAUKEE AMERICAN ASS'N et al. v. LANDIS (BENNETT, Intervener).

### No. 9871.

District Court, N. D. Illinois, E. D.

April 21, 1931.

Burry, Johnstone, Peters & Dixon, of Chicago, Ill., and Swarts, Reyburn & Kawin, of St. Louis, Mo., for plaintiffs.

David D. Stansbury, of Chicago, Ill., for intervener Bennett.

George W. Miller and Busby, Weber, Miller & Donovan, all of Chicago, Ill., for defendant.

LINDLEY, District Judge.

The original bill, filed by Milwaukee Association (herein termed the Milwaukee

Club), sought to enjoin defendant, as commissioner of organized baseball, from disapproving an optional contract between the St. Louis American League (herein termed the St. Louis Club) and said plaintiff, assigning to Milwaukee a then existing agreement between the intervener, Bennett, as player, and the St. Louis Club, as owner, but reserving the right to recall Bennett to St. Louis. By stipulation of the parties, application for injunction was not pressed, and Bennett was allowed to play with Milwaukee until the end of its season. In September, 1930, he was returned to St. Louis, and the amended supplemental bill was filed with the St. Louis Club as additional plaintiff. In that bill plaintiffs seek to restrain the commissioner from interfering with the relation between Bennett and plaintiffs or either of them or with Bennett's contract with St. Louis and any assignment thereof previously or subsequently made. The commissioner answered that his action and what he proposed to do, if not enjoined, are clearly within his authority and in accord with the contracts and rules governing organized baseball. Bennett intervened, insisting that the commissioner is justified in his position and asserting that, because of plaintiffs' actions, he (Bennett) should be relieved of his contract relationships with them.

The code governing organized baseball is made up of: (1) The Major League agreement between the two Major Leagues and their sixteen constituent clubs; (2) Major League rules in code form, duly adopted, binding upon all of the Major League Clubs; (3) Major-Minor League agreement between the two Major Leagues on the one part and the National Association of Professional Baseball Leagues, otherwise known as the Minor Leagues, on the other part; (4) Major-Minor League rules; (5) National Association agreement, that is, the contract between all of the official Minor Leagues included within the National Association.

Plaintiff St. Louis Club is a member of the American Major League. All other clubs herein concerned belong to official Minor Leagues.

Under the Major League agreement the office of commissioner was created, and his functions were defined as follows:

"(a) To investigate, either upon complaint or upon his own initiative, any act, transaction or practice charged, alleged or suspected to be detrimental to the best interests of the national game of baseball; with authority to summon persons and to order the production of documents; and, in case of refusal to appear or produce, to impose such penalties as are hereinafter provided.

"(b) To determine, after investigation, what preventive, remedial or punitive action is appropriate in the premises, and to take such action either against Major Leagues, Major League Clubs or individuals, as the case may be."

He was given jurisdiction to hear and determine finally any disputes between leagues and clubs or to which a player might be a party, certified to him, and authorized, in case of "conduct detrimental to baseball," to impose punishment and pursue appropriate legal remedies; to determine finally a disagreement over any proposed amendment to the rules; and "to take such other steps as he might deem necessary and proper in the interest and morale of the players and the honor of the game." Optional agreements with players were defined and assignments thereof required to be filed with, and approved by, the commissioner. The parties agreed to abide by the decisions of the latter and the discipline imposed by him under the agreement and severally waived right of recourse to the courts. Similar covenants appear in the Major-Minor agreement, the National Association agreement and the uniform contracts with players.

The Major-Minor League agreement recognizes the office of commissioner and the jurisdiction aforesaid and provides that, in case of any dispute between any Major club and any Minor club, the disputants may certify the dispute to the commissioner for decision, and that his determination shall be final.

The various agreements and rules, constituting a complete code for, or charter and by-laws of, organized baseball in America, disclose a clear intent upon the part of the parties to endow the commissioner with all the attributes of a benevolent but absolute despot and all the disciplinary powers of the proverbial pater familias.

Bennett, in July, 1926, being under contract to play for Little Rock, was by it assigned to the Tulsa Club (class "a" of the Minors), with whom he played the remainder of 1926 and all of 1927. On April 5, 1928, Tulsa, with the approval of the commissioner, assigned its agreement with Bennett to St. Louis, and Bennett signed a contract with the latter for 1928. On May 10, 1928, St. Louis assigned this contract to Tulsa under an optional agreement, approved by the commissioner, retaining the right to recall Ben-

nett. On May 25, 1928, St. Louis, having previously requested waivers of all other Major clubs, as required by the rules, canceled the reserved right to claim Bennett. The commissioner thereupon notified the National Association that St. Louis had canceled its option. On May 11, 1928, Bennett signed a contract to play with Tulsa for the remainder of 1928. On September 10, 1928, Tulsa assigned this contract to the Milwaukee Club (class "aa" of the Minors).

On December 5, 1928, Milwaukee, having previously obtained waivers from the seven other clubs of its league—the American Association—assigned its contract with Bennett to the Wichita Falls Club (class "a," Minor League) for $4,500, and Bennett signed a contract with that club for 1929. On September 6, 1929, Pittsburgh offered Wichita Falls $10,000 for Bennett and was advised by the latter that it had already submitted a proposition to St. Louis upon the player and that, if St. Louis did not take him, it would take the matter up further with Pittsburgh. On September 10, 1929, Wichita Falls assigned Bennett's contract to St. Louis for $5,000. In January, 1930, St. Louis requested from all other Major League clubs waivers upon their right to claim the services of Bennett. The New York American Club and the Pittsburgh Club each claimed him and offered St. Louis $7,500 for its contract. St. Louis did not accept the offer of either of the claiming clubs and on or about January 30, 1930, withdrew its request for waivers. On March 9, 1930, Bennett signed a contract with St. Louis for 1930. On April 7, 1930, St. Louis executed an optional agreement, assigning the player to Milwaukee, but reserving an option upon him. This contract was forwarded to the commissioner's office for approval, and was received by him on April 9, 1930. On April 10, 1930, Bennett signed a contract with Milwaukee for 1930 and finished the season there under the stipulation of the parties hereinbefore mentioned.

Upon receipt of the copy of the optional assignment by St. Louis to Milwaukee, the commissioner instituted an investigation of the stock holdings of Ball, president and principal stockholder of the St. Louis Club, in various Minor League clubs and on June 19, 1930, notified St. Louis and Milwaukee that he disapproved the assignment of Bennett to Milwaukee; that Bennett should be returned to St. Louis, which must either retain him as a Major League player for the year or longer, transfer him outright to some club not controlled or owned by St.

Louis or its owners or release him unconditionally. Milwaukee then filed its original bill herein, and after the completion of the season, Bennett returned to St. Louis upon its recall, and the latter and Milwaukee filed the amended supplemental bill.

On September 3, 1930, St. Louis asked for waivers on Bennett, and Pittsburgh claimed his services, whereupon St. Louis withdrew its request for waivers. The offer of the Pittsburgh Club at that time was $7,500.

The investigation of the commissioner disclosed that Mr. Ball, since February 16, 1928, by reason of stock ownership and otherwise, has completely controlled the clubs of St. Louis, Tulsa and Wichita Falls and that since July, 1927, he has owned 50 per cent. of the stock of the Milwaukee Club and since January 19, 1929, completely controlled that club.

The commissioner on June 19, 1930, after stating the facts, said that it was clear that, between the time of his "outright" transfer to St. Louis and his reacquisition by that club, the player had had two seasons of Minor League services with clubs controlled by Ball, during which time the St. Louis Club could at any time have reacquired him (because of such control) just as effectively as if it had retained an option upon him. Notwithstanding these facts, he observed, St. Louis proposed to transfer Bennett for the third successive season to a Minor club without securing Major League waivers. The commissioner concluded that Bennett, whose services had been at all times subject to the one club owner's control, through control of the clubs holding ostensible title to his services, could not be regarded as a purchased player as of the date of the last purchase, within the purpose and intent of the Major League rules; that the period within which Bennett could be optioned without waivers expired on April 5, 1930, the end of two years from the date of the original acquisition by St. Louis and that that period, expressed in the rules, could not be extended by the process of apparent outright transfer back and forth amongst clubs actually controlled by one individual.

The question for decision, therefore, is whether, under the code governing organized baseball, an individual controlling a Major League club may so manipulate his control of a number of Minor League clubs also as in the end to achieve a situation whereby a player originally acquired by purchase by the Major club thus controlled may be sold and

transferred back and forth from the Major club to the Minor clubs and from the Minor clubs to the Major club for an indefinite period of time, in excess of two years, under apparent outright sales agreements, without disclosing to other Major clubs the secret control mentioned and without furnishing opportunity to them to claim the player's services.

The parties endowed the commissioner with wide powers and discretion to hear controversies that might be submitted to him and of his own initiative to observe, investigate and take such action as necessary to secure observance of the provisions of the agreements and rules, promotion of the expressed ideals of, and prevention of conduct detrimental to, baseball. The code is expressly designed and intended to foster keen, clean competition in the sport of baseball, to preserve discipline and a high standard of morale, to produce an equality of conditions necessary to the promotion of keen competition and to protect players against clubs, clubs against players and clubs against clubs.

Under the rules, a Major League club may assign a player to a Minor League club, but each of the Major clubs must be given an opportunity to take an assignment; and it is only when no such club refuses to waive such opportunity that the player may be sent to a Minor club. There is an exception to this, however, in the Major-Minor rules, which is as follows:

"The contract of a player signed as a free agent or acquired from a Minor League Club otherwise than by selection, may be assigned to a Minor League Club, under approved optional agreement, within two years (from date of signing contract, in the case of a free agent; and from date of original transfer agreement recorded with the Secretary-Treasurer of the Advisory Council, in the case of a player acquired from a Minor League Club without giving opportunity to the other fifteen Major League clubs to take such contract through the regular waiver channels; provided, that no such player may be assigned outright, or right of recall cancelled, unless waivers shall have been asked and granted; and provided, further, that such player shall not, in either case, have been in active service in either or both Major Leagues an aggregate of two full championship seasons, or been transferred under optional assignment by a Major League Club two or more seasons."

Bennett was acquired from a Minor League club otherwise than by selection in April, 1928. Section 13 (b) 1 provides that an optional agreement shall be permitted for not more than two successive seasons in the case of any one player. Under section 13 (g), the right of a Major League club to a player, except under an optional agreement, approved by the commissioner, ceases when the player becomes a member of the Minor League club, and no arrangement between clubs for the loan or return of a player other than by an approved optional agreement shall be binding by the parties to it or be recognized by other clubs. A club may assign to another club an existing contract with a player. Uniform contracts are required providing that the player will not play during said year with any club other than the one to whom he is assigned. The rules forbid tampering with ball players and enjoin negotiations respecting employment, unless the club with which a player is connected shall have expressly authorized such negotiations, recite that the supply of signed players is not equal to the demand and create definite limits of players for each club. It is agreed that no organization and no individual, player, or owner may by subterfuge or indirection evade the provisions of the code.

The code provides for a selection period of five days at the time of the World's series, during which a Major club may indicate or select one player in a Minor club subject to selection, the assignment of whose contract is desired. The player so acquired is known as a "selected player." Under this method, preference is given to the weaker clubs; the purpose being to strengthen them over the stronger clubs by giving them first choice selection. No agreement is to be made between a Major club and a Minor club or between two Minor clubs for the purpose or with the effect of covering up a player from selection.

A Minor club is not compelled to accept the system of selection. Milwaukee and Tulsa were not, but Wichita Falls was, subject to selection. However, under the agreement of May 10, 1928, which St. Louis executed with Tulsa when it returned Bennett to Tulsa, Bennett was made subject to selection, notwithstanding that he might thus be acquired by some club exempt from selection. These and other provisions disclose an intention to preserve the right of selection and increase the number of players subject to offer from Major Leagues, and thus to enable them to advance in their profession.

A club may terminate its relationship with the player by release or assignment, but, before a Major club can release a player unconditionally, it must give every other Major club an option to waive or to refuse to waive on the player. Thus the opportunity of the player of remaining in Major baseball is enhanced.

It is apparent that Ball, by controlling the St. Louis, Wichita Falls, Tulsa, and Milwaukee Clubs and, in addition Springfield, Mo., is and has at all times since April 5, 1928, been able at his own discretion to direct the transfer of Bennett at any time from any one of these clubs to any other of them without asking for waivers from Major League clubs. Though there is nothing in the rules to prohibit an individual owning control of a Major League club from likewise owning control of Minor League clubs, the intent of the code is such that common ownership is not so to be made use of as to give one individual, controlling all of the clubs mentioned, the absolute right, independent of other clubs, to control indefinitely a player acquired and switched about by apparent outright purchases.

Prior to publication of the fact that St. Louis and the Minor clubs concerned are all under one man's control, no one had knowledge thereof except Ball and his associates. Apparently Bennett did not know of this control, and the commissioner had no such knowledge until, after first having vainly endeavored to secure the information from Ball, he made a complete investigation. Therefore, when, on April 7, 1930, Bennett was assigned and contracted to go to Milwaukee, he did not know that he was being sent to a club controlled by the same man who controlled the selling club. When we remember that this transfer to Milwaukee was in the face of an offer of $10,000 for Bennett by Pittsburgh, it is apparent that St. Louis was at work to keep Bennett out of the Major Leagues in the Minors; to keep control of Bennett's services; and to prevent any Major club from securing his services. If the plaintiffs' position were to prevail, this situation might continue indefinitely, and the commissioner would be powerless to prevent the same, even though such conduct is detrimental to the national game of baseball and violative of the intent of the provisions of the code.

We have observed that, in addition to his jurisdiction over disputes certified to him, the commissioner is empowered to investigate upon his own initiative any act, transaction, or practice charged or alleged to be detrimental to the best interests of baseball, to determine what preventive, remedial, or punitive action is appropriate in the premises and to take such action against leagues or clubs as the case may require. Certain acts are specified as detrimental to baseball, but it is expressly provided that nothing contained in the code shall be construed as exclusively defining or otherwise limiting acts, practices or conduct detrimental to baseball. It is contended that this phrase should be so construed as to include only such conduct as is similar to that expressly mentioned. However, the provisions are so unlimited in character that we can conclude only that the parties did not intend so to limit the meaning of conduct detrimental to baseball, but intended to vest in the commissioner jurisdiction to prevent any conduct destructive of the aims of the code. Apparently it was the intent of the parties to make the commissioner an arbiter, whose decisions made in good faith, upon evidence, upon all questions relating to the purpose of the organization and all conduct detrimental thereto, should be absolutely binding. So great was the parties' confidence in the man selected for the position and so great the trust placed in him that certain of the agreements were to continue only so long as he should remain commissioner.

Plaintiffs contend that the commissioner has no power to declare a player a free agent. In his answer, the commissioner states that it is his view that, by reason of the alleged breach of the code by plaintiffs and their denial of Bennett's rights, plaintiffs have made it his duty to declare Bennett absolved from any contractual obligations which he may have had with either plaintiff and to declare him a free agent. Obviously declaring Bennett a free agent is a mere declaration of legal effect, that is, the result of finding that the St. Louis Club has forfeited its rights by violating the spirit and intent of the code. Whether there is given to the commissioner the power in so many words to declare Bennett a free agent is immaterial, since the agreements and rules grant to the commissioner jurisdiction to refuse to approve Bennett's assignment by St. Louis to Milwaukee, and to declare him absolved from the burdens of the same and of his contract with St. Louis.

Plaintiffs complain that the commissioner's declaration will deprive St. Louis of the benefits of its contract with Bennett. Obviously this is true, but, if St. Louis' conduct has been such as to entitle Bennett to be re-

lieved therefrom, that club cannot complain, because it has created the situation resulting in the loss of his services. During three successive seasons St. Louis, apparently with an intent so to do, prevented Bennett from playing in any Major League, and that club, through its owner and controller, Ball, and through his control of Tulsa, Wichita Falls, and Milwaukee, has been able to accomplish that which the two-year rule hereinbefore referred to plainly forbids.

It is asserted that this wide grant of jurisdiction of the commissioner is an attempt to deprive the court of its jurisdiction and that such a provision as is contained in these agreements, rules, and uniform contract is contrary to public policy. No doubt the decision of any arbiter, umpire, engineer, or similar person endowed with the power to decide may not be exercised in an illegal manner, that is fraudulently, arbitrarily, without legal basis for the same or without any evidence to justify action. The many cases cited upon the power and jurisdiction of such officials are not in serious conflict. An agreement to arbitrate a controverted question and to deprive all courts of jurisdiction, so long as in executory form, is quite commonly held void, but an actual submission to an arbiter or umpire in good faith is proper, and decision under same is binding, unless it is unsupported by evidence, or unless the decision is upon some basis without legal foundation or beyond legal recognition.

Plaintiffs submitted to the defendant as commissioner an optional contract, which under the code could not be effective unless approved by him. After ascertaining the facts, he refused to approve the same. This, if we look at it from the point of arbitration, was an executed agreement for arbitration, and called for more than ministerial action. As we have seen, the commissioner is given almost unlimited discretion in the determination of whether or not a certain state of facts creates a situation detrimental to the national game of baseball. The commissioner rightfully found that the common control of St. Louis and the named Minor Clubs by one person made it possible to create a situation whereby the clear intent of the adopted code that the players under the control of a Major club should not be kept with a Minor club more than two successive seasons without giving other Major clubs the right to claim him was clearly violated, and a result achieved highly detrimental to the national game of baseball. The facts negative any assertion

that this decision was made arbitrarily or fraudulently. It was made in pursuance of jurisdiction granted to the commissioner with the expressed desire to achieve certain ends, that is, to keep the game of baseball clean, to promote clean competition, to prevent collusive or fraudulent contracts, to protect players' rights, to furnish them full opportunity to advance in accord with their abilities and to prevent their deprival of such opportunities by subterfuge, covering or other unfair conduct. Without control by St. Louis, Wichita Falls would not have accepted $5,000 from St. Louis for Bennett after Major clubs had offered to pay $10,000. Without this control, it would have been impossible for St. Louis to buy Bennett from Wichita Falls for $5,000, when other Major clubs offered $10,000 for him. No sanely managed corporation would have deliberately refused to sell for $10,000 when the highest competing offer was $5,000, unless bidden so to do by its master, inspired by a purpose other than the best interests of the corporation.

The code does not forbid Mr. Ball controlling any number of Minor clubs, but so to manipulate that control as to transfer and retransfer a player under the form of outright sales and purchases, but at all times to retain secret, absolute control and to have at all times the power to switch the player at the whim of one man, irrespective of the player's rights, is to produce a situation where there is no opportunity for other Major clubs to bid for the player, a condition plainly detrimental to baseball. Such situation is inimicable to the best interests of players and competing clubs and directly in the face of the clear intent of the code. Therefore it cannot be said that this commissioner, when he refused to approve the option contract submitted to him and ruled that Bennett was freed from his obligations to St. Louis, endowed as he was, did anything other than enter an order clearly within his discretion, unaffected by any illegal, invalidating element. To have decided otherwise would have exhibited a lack of fidelity to the trust imposed upon him and to the obligations which he had accepted.

Anything that Bennett did when he was wholly unacquainted with the secret control of all of the various entities with whom he contracted can in no wise bind him. Plaintiffs will not be permitted to conceal from him material facts affecting his own rights, and then claim estoppel upon his part by his apparent acceptance induced by plaintiffs'

concealment. Familiar rules, unnecessary to be quoted here, are fully decisive of that proposition.

It is contended by plaintiffs that the two-year limitation upon assignments shall apply from the date of the last acquisition of the player; that all prior acquisition contracts must be ignored; that the word "original" in the phrase "two years from the date of the original transfer agreement" refers to the copy of the contract filed with the secretary-treasurer, being one of its counterparts. Avoiding prolonged discussion, the court is of the opinion that the clear intent of this rule is that the two-year limitation shall run from the date of the original contract of acquisition. But, irrespective of this construction, the attempt of St. Louis to transfer Bennett to a Minor club after two years from April 5, 1928, without waivers was, in view of the secret control of the St. Louis Club and the various Minor clubs, wholly void, because it violated the purpose and intent that no player under the control of a Major club should be kept in the Minors more than two seasons without opportunities to other Majors to select or to claim.

There are many other points ably argued by counsel, but the facts and questions necessary to a decision are included within what has been said. The court is of the opinion that the commissioner acted clearly within his authority; that Bennett should be freed from his obligations of any contract with either plaintiff; that the prayer for injunction should be denied, and the bill dismissed for want of equity at the costs of plaintiffs. Proper decree may be submitted.