ATLANTA NATIONAL LEAGUE BASE-
BALL CLUB, INC., and Ted Turner

v.

Bowie K. KUHN, Individually and as
Commissioner of Baseball.

Civ. A. No. C77–383A.

United States District Court,
N. D. Georgia,
Atlanta Division.

May 19, 1977.

Allen E. Lockerman, Tench C. Coxe, Mark S. Kaufman, Robert W. Webb, Jr., of Troutman, Sanders, Lockerman & Ashmore, Atlanta, Ga., for plaintiffs.

Richard J. Wertheimer, Washington, D. C., S. Phillip Heiner, Atlanta, Ga., for defendant.

## ORDER

EDENFIELD, District Judge.

Plaintiffs brought this diversity action pursuant to 28 U.S.C. § 1331 seeking to enjoin defendant from imposing certain sanctions against plaintiffs. Both sides have filed motions for summary judgment, and the court deferred ruling on such motions pending a trial on the merits. The case was heard on April 25 and 26, 1977, and the court is now prepared to rule on the merits.

*Factual Background*

Plaintiff Turner is Chief Executive Officer of plaintiff Atlanta National League Baseball Club ("Atlanta Club"). The Atlanta Club, together with 25 other teams, is a signatory to an agreement known as the Major League Agreement. That agreement, the latest version of which was executed on January 1, 1975, constitutes a contract between the two baseball league associations, the American League of Professional Baseball Clubs and the National League of Professional Baseball Clubs, of which the Atlanta Club is a member. The Agreement establishes the office of the defendant, the Commissioner of Baseball, and defines his authority, powers and responsibilities.

The origin of the instant controversy can be traced to the changes that were made in baseball's reserve system in 1976. Prior to that year, the collective bargaining agreements between the Major League Baseball Players Association and the Major League Club Owners were interpreted to reserve to clubs a perennial one-year option to renew a contract with a player, which option was renewable at the end of each year. This system, which essentially bound a player to a team perpetually unless traded or released, was known as the reserve system. In 1975, the Players Association filed grievances on behalf of two players, Andy Messersmith and Dave McNally, challenging this system. An arbitration panel considered the grievances and concluded that players who had completed their last year of a contract with a particular club would be obligated, at the option of the club, to play only one additional year for that club. Unless the player and club signed a new agreement during this "option year," the player became a "free agent," with the right to negotiate contract terms with other major league clubs at the end of the option year season. The decision of the arbitration panel was upheld by the Court of Appeals for the Eighth Circuit in *Kansas City Royals Baseball Corp. v. Major League Baseball Players Ass'n.*, 532 F.2d 615 (8th Cir. 1976).

In an effort to implement the *Kansas City Royals* decision, the representatives of the Players Association and the club owners met to hammer out a new collective bargaining agreement. An agreement was reached in July, 1976 which established a special reentry draft to be conducted in November of each year for those players who had become free agents at the end of a baseball season. Procedures were established for the November draft whereby negotiation rights with each free agent could be drafted by up to twelve teams, each of which were then given negotiation rights for that player. Between the end of the season and three days prior to the draft, however, only the club of record, the team for which the prospective free agent was playing out his option, had negotiation rights with that player. With the advent of this new reserve system there was concern on the part of the clubs and the Commissioner that the clubs of record have the maximum opportunity to retain their prospective free agents in an effort to preserve a competitive balance among the clubs in professional baseball. Accordingly, during the post-season period in which the club of record has exclusive negotiating rights with a free agent, other clubs were allowed to talk with the free agent or his representative about the merits of contracting with a particular team, "*provided, however,* that the Club and the free agent shall not negotiate terms of contract with each other." Collective Bargaining Agreement, Art. VII, ¶ 3(a). To help ensure that this provision was observed and that tampering was avoided, both the Executive Council, established by the Major League Agreement, and the Player Relations Committee encouraged the Commissioner to issue warnings that tampering violations would not be tolerated, and to make every effort to deter such violations.

On August 27, 1976 the Commissioner issued the first in a series of warnings in the form of a teletyped notice to each major league club. The directive concerned the fact that press reports were circulating which speculated on the amount potential

free agents [1] would be paid to sign. Where club personnel were the source of such reports, the conduct was cautioned as constituting tampering,[2] which would no longer be tolerated.[3]

A second warning was issued on September 28, 1976 which specified that both direct and indirect dealings were prohibited prior to the end of the season:

(3) There should be no direct contacts of any kind with potential free agent players on another club without the prior written consent of their current club, which should not be sought or given without the advance approval of this office.

(4) The indirect contacts which are prohibited include (A) conversations between a club and the player through his representative or other third party intermediary; and (B) public comments which would indicate an interest in signing any such player.

The bottom portion of the directive spoke of conduct during the post-season period prior to the November 4 draft and warned against negotiations between free agent and club:

A player who has completed his option year without signing a new contract will be free to talk with any club and discuss the merits of his contracting with such club when and if he becomes eligible to do so. But the club and the player must not negotiate terms or enter into a contract unless or until the club has acquired negotiation rights with regard to the player as provided in the new basic agreement.

The Commissioner cautioned "all concerned that if they are in doubt concerning the propriety of any particular contact, the preferable course would be to avoid it."

The third warning, issued on October 5, 1976, emphasized that the tampering rule would be enforced and stated that "Possible penalties will include fines, loss of rights under [amateur free agent] and re-entry drafts and suspension of those responsible." Three more notices were issued, directing clubs and players not to inquire of each other concerning financial terms, and advising strict adherence to the guidelines previously announced.

On September 24, 1976 the Commissioner held a hearing on certain alleged tampering violations committed by John Alevizos, then Executive Vice President and General Manager of the Atlanta Club, in communicating with Gary Matthews, who was then completing his option year with the San Francisco club. The Commissioner found that Alevizos had violated 3(g) and fined the Atlanta Club $5,000 for each of two violations and ruled that the Atlanta Club would be denied a selection in the first round of

---

1. *Potential* free agents refers to the status of players prior to the end of the season who are playing out their options.

2. Rule 3(g) of the Major League Rules describes tampering as follows:

> To preserve discipline and competition, and to prevent the enticement of players, coaches, managers and umpires, there shall be no negotiations or dealings respecting employment, either present or prospective, between any player, coach or manager and any club other than the club with which he is under contract or acceptance of terms, or by which he is reserved, or which has the player on its Negotiation List, or between any umpire and any league other than the league with which he is under contract or acceptance of terms, unless the club or league with which he is connected shall have, in writing, expressly authorized such negotiations or dealings prior to their commencement.

The rule does not refer to free agents, as it was written prior to the drastic changes in the reserve system.

3. The directive contained the following language:

> Press reports are circulating to the effect that various of our clubs are interested in signing potential players now playing for other clubs. These reports have at times included speculation on the amount the players will be paid to sign. It is inescapable that in some instances our club personnel is the source of these press reports.
>
> You have been reminded before and I now caution you again that such conduct by our clubs is improper and constitutes tampering. While I have tried to view such conduct with a certain amount of tolerance in the past, that is no longer possible under the radically changed circumstances of the present time. Please guide yourselves accordingly.

the amateur player draft to be held in January, 1977. In his October 5 decision, the Commissioner indicated that he had considered suspending Alevizos, but Alevizos' employment with the Atlanta Club had already been terminated.

On October 20, 1976 Turner attended a cocktail party in New York City sponsored by the New York Yankees Club, and there engaged in a conversation with Robert Lurie, co-owner of the San Francisco club. In the presence of several media representatives, Turner told Lurie that he would do anything to get Gary Matthews and that he would go as high as he had to. *See* Commissioner's decision of December 30, 1976. Turner's comments were reported by a few San Francisco newspapers. On October 25, 1976, Lurie filed a complaint concerning these statements with the Commissioner, and the Commissioner notified Turner that, based on Lurie's allegations,

> it appears that the Atlanta Club may have violated (1) Major League Rule 3(g); (2) the provisions of the collective bargaining agreement with the Players Association prohibiting negotiation with free agent players; or (3) the guidelines issued by this office by teletypes of September 28 (last paragraph), October 5, 11, 12 and 13, 1976 regarding relationships with free agent players prior to November 1st.

A request for a hearing was made and on November 3, 1976 an informal conference was held at which time the Commissioner indicated that Atlanta could participate in the November 4 draft.

The draft was conducted on November 4, and twelve teams drafted negotiation rights with Matthews by the fifth round. The same day a formal hearing was held in which Turner admitted making the above comments, claiming that they were made in jest, but denied that there had been any direct or indirect negotiations of contract terms with Matthews or his agent. Matthews testified by way of affidavit that there had been no direct or indirect contacts with the Atlanta Club as to contract terms.

On December 30, the Commissioner announced his decision in the Turner matter. He concluded that Turner's statements

> were in clear violation of the prohibitions of the directives . . . . These statements clearly had the effect of subverting the collective bargaining agreement and the re-entry draft procedures adopted pursuant to it. I am therefore compelled to find that they were not in the best interests of Baseball within the meaning of Section 3, Article I of the Major League Agreement.

December 30 decision at 2. In considering appropriate sanctions, the Commissioner decided not to disapprove Matthews' contract with the Atlanta Club which had been signed on November 17. This decision was based on the urgings of Turner and upon the Commissioner's conclusion that Matthews had not engaged in any improper contact. Instead, the Commissioner decided to suspend Turner from baseball for one year, reasoning that (1) Turner had suggested that such a sanction would be appropriate, (2) this was the second Atlanta tampering violation, and (3) the Commissioner had warned in one of his directives that suspensions might be imposed. As a further sanction, the Commissioner decided that the Atlanta Club would not be entitled to exercise its first round draft choice in the June, 1977 amateur free agent draft.

On January 18, 1977 the Commissioner met with several Atlanta community leaders and then held an additional hearing. An order implementing the suspension was issued on January 25 and stated that for one year Turner could not exercise any powers in connection with the management of the Atlanta Club, or confer, advise or otherwise communicate with persons exercising such powers as to their exercise. In addition he is forbidden to visit the Atlanta clubhouse or offices or communicate with any major league or professional club or its personnel in connection with any matter involving the Atlanta Club or baseball. However, the Commissioner ruled that the suspension would be reviewed after six months, and that Turner could apply to the Commissioner for permission to engage in

baseball-related activities in extraordinary circumstances.

On March 8, 1977, Turner and the Atlanta Club filed this action, challenging the Commissioner's authority to (1) issue the six directives, (2) conclude that plaintiffs had violated those directives, (3) enforce the collective bargaining agreement, and (4) impose the sanctions described above. Plaintiffs also alleged that the sanctions imposed constituted a tortious interference with the business relations of the plaintiffs.

*Extent of Judicial Review*

■ Defendant first claims that plaintiffs are barred from bringing this action, having waived their access to the courts under the Major League Agreement. Article VII, § 2, of that agreement provides:

> The Major Leagues and their constituent clubs, severally agree to be bound by the decisions of the Commissioner, and the discipline imposed by him under the provisions of this Agreement, and severally waive such right of recourse to the courts as would otherwise have existed in their favor.

Plaintiffs contend that this provision is unenforceable in that it violates public policy.

When faced with the same waiver provision in *Finley & Co. v. Kuhn*, No. 76C–2358 (N.D.Ill., September 7, 1976), the court rejected the Commissioner's argument that the waiver of recourse to the courts deprived the court of subject-matter jurisdiction.

> Simply stated, defendant's legal theory, if accepted, would entitle him to render a decision on any question dealing with baseball no matter how unauthorized or arbitrary that decision might be. This is an untenable position. The extent of defendant Kuhn's contractual power is a question for the court. Indeed, whether the Commissioner's decision in issue here is the type of decision to which the parties agreed they would be bound is itself at issue. Accordingly, jurisdiction is not lacking.

This court agrees with Judge McGarr's reasoning, which is equally applicable to the instant case. Plaintiffs herein challenge the Commissioner's authority to penalize for the acts committed, and to impose certain sanctions chosen. Accordingly, the court must review the Agreement to which the parties agreed to be bound which purportedly gives to the Commissioner the authority to act as he did.

Defendant argues that Judge McGarr abandoned his reasoning in his subsequent order wherein he concluded that the Commissioner had acted within the scope of his authority under the Agreement. In his order of March 17, 1977, issued after a full hearing on the merits, the court noted

> [w]hat the parties clearly intended was that the Commissioner was to have jurisdiction to prevent any conduct destructive of the confidence of the public in the integrity of baseball. So broad and unfettered was his discretion intended to be that they provided no right of appeal, and even took the extreme step of foreclosing their own access to the courts.

However, the court in *Finley* did not vacate its earlier holding as to its power to review the Commissioner's decision, for the above-quoted language is part of the result of such a review. Instead, Judge McGarr refers to the waiver provision as being indicative of the vast discretion given to the Commissioner. It operates to make the *Finley* court, and this court, hesitant, but not powerless, to upset the exercise by the Commissioner of such discretion.

■ In a further attempt to limit the extent of judicial review, defendant argues that the Commissioner acted as an arbitrator herein, and the parties agreed under the Major League Agreement to be bound by such arbitration. See Article VII, § 1. Pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1, *et seq.*, such arbitration agreements are enforceable, and in reviewing an arbitration decision, the court is limited to four narrow questions: Whether (1) the decision is the result of fraud; (2) there is evidence of bias on the part of the arbitrators; (3) the arbitrator was guilty of misconduct; and (4) the arbitrator exceeded his powers. 9 U.S.C. § 10(a)–(d). *See Liv-*

*ingston v. Shreveport Texas League Baseball Corp.*, 128 F.Supp. 191, 204 (W.D.La. 1955).

■ Although the Commissioner is designated as an arbitrator in Article VII, § 1, his task in that capacity is to resolve "[a]ll disputes and controversies related in any way to professional baseball *between* clubs (including their officers, directors, employees and players)." (Emphasis added.) Plaintiffs argue that this section is inapplicable to the instant situation because this was not a dispute between parties as referred to in § 1. The initial telegram from Kuhn to Turner on October 28, 1976 stated—

> The San Francisco Club has filed with this office allegations from which it appears that the Atlanta Club may have violated [Rule 3(g), the Collective Bargaining Agreement and the Guidelines].

However, in Kuhn's October 5, 1976 telegram warning that tampering violations would not be tolerated, the Commissioner encouraged "clubs and club personnel to submit to this office any information in their possession regarding possible instances of tampering" and designated Alexander Hadden to serve as "clearinghouse" for this information. Thus, Lurie's complaint was, in a sense, solicited by the Commissioner.

In this respect, and bearing in mind that it was the Commissioner's own directive that he was claiming to enforce, the instant case is similar to *Professional Sports, Ltd. v. Virginia Squires Basketball*, 373 F.Supp. 946 (W.D.Tex.1974), wherein the court found an agreement to be bound by the Commissioner of Basketball's arbitration decision inapplicable where the dispute was one generated by the Commissioner himself. 373 F.Supp. at 950. *See Hurd v. Illinois Bell Telephone Co.*, 136 F.Supp. 125, 155 (N.D.Ill.1955):

> The judicial mind is so strongly against the propriety of allowing one of the parties, or its especial representative, to be judge or arbitrator in its own case, that even a strained interpretation will be resorted to if necessary to avoid that result.

That the Commissioner did not act as an arbitrator herein is supported by the sanctions imposed. Typically in an arbitration dispute the arbitrator adjudicates the rights as between two parties and accords relief to one of them. Here, the Commissioner was not deciding Lurie's rights vis á vis Turner, and granting relief to Lurie; rather, a punishment was imposed which would primarily affect only Turner and the Atlanta Club.

The court is inclined to view the Commissioner's authority as deriving not from the arbitration clause of the Major League Agreement, but from Article I, § 2, where he is given the power to "INVESTIGATE, either upon complaint or upon his own initiative, any act . . . alleged or suspected to be not in the best interests of the national game of Baseball," and "TO DETERMINE, after investigation, what . . punitive action is appropriate . . . ." (Emphasis in original.) Under Article VII, § 2, the parties to the Agreement agreed to be bound by the discipline imposed by the Commissioner pursuant to his authority thereunder and to waive appeals to the court. In any event, a decision as to whether the Commissioner also acted as an arbitrator is unnecessary since this court's decision on the merits is one that could be reached despite the limited judicial review of arbitration decisions.

### The Commissioner's Authority

■ Article I, § 2 of the Major League Agreement gives to the Commissioner substantial authority and discretion:

> (a) TO INVESTIGATE, either upon complaint or upon his own initiative, any act, transaction or practice charged, alleged or suspected to be not in the best interests of the national game of Baseball, with authority to summon persons and to order the production of documents, and, in case of refusal to appear or produce, to impose such penalties as are hereinafter provided.
>
> (b) TO DETERMINE, after investigation, what preventive, remedial or punitive action is appropriate in the premises, and to take such action either against Major Leagues, Major League Clubs or individuals, as the case may be.

(c) TO HEAR and determine finally any dispute between the Major Leagues which may be certified to him for determination by the President of either Major League.

(d) TO FORMULATE, and from time to time announce, the rules of procedure to be observed by the Commissioner and all other parties in connection with the discharge of his duties. Such rules shall always recognize the right of any party in interest to appear before the Commissioner and be heard and the right of the Presidents of the two Major Leagues to appear and be heard upon any matter affecting the interests of the Major Leagues, or either of them.

To the extent this case involves a violation of the Major League Agreement, the court has no hesitation in saying that the defendant Commissioner had ample authority to punish plaintiffs in this case, for acts considered not in the best interests of baseball. As one court has said, the Commissioner of baseball has "All the attributes of a benevolent but absolute despot and all the disciplinary powers of the proverbial pater familias." *Milwaukee American Assn. v. Landis,* 49 F.2d 298 (N.D.Ill.1931).

The question which makes the case confusing and difficult, however, is to what extent the Major League Agreement applies here. This doubt arises for two reasons: First, when the current Major League Agreement was made in 1975 there did not exist in baseball any "free agencies" created solely by expiration of the player's contract, and certainly there was no "free-agent draft." Conceding that the Major League Agreement might be sufficiently broad to apply ordinarily to future developments, there is a still bigger obstacle: When such "free-agencies" came into being in 1976 as a result of the arbitration and litigation reported in *Kansas City Royals v. Major League Players Assn., supra,* the parties entered into a new, separate and independent contract to deal with the new situation thus created. This new agreement, in the form of a collective bargaining agreement between the clubs and the Players Association, is complete within itself. It

provides for the creation of free agencies upon the expiration of player contracts (Art. XVII, B); spells out reentry procedures (Art. XVII, C); forbids clubs from contracting or negotiating terms with free agents in the interim between the end of the season and the reentry draft (Art. XVII C.(2)); and provides for three-party arbitration "as the exclusive remedy of the parties." (Art. X, prelim. par.)

Obviously this new agreement modified the Major League Agreement at least as to such subject matter as is covered by the later agreement. The two agreements must now be read together as forming the framework for the government of Major League baseball. The powers of the Commissioner under the Major League Agreement are therefore modified only so as to avoid infringing upon the rights secured by the parties to the collective bargaining agreement.

*The Directives*

■ Plaintiffs argue that the Commissioner lacked the authority to issue the six directives because (1) the Commissioner's rulemaking authority is limited to procedural rules under § 2(d); (2) the subject matter of the directives was covered by the Collective Bargaining Agreement and the Commissioner has no authority to promulgate rules under that agreement. However, plaintiffs' understanding of the role of the Commissioner is much narrower than was intended by the parties to the Major League Agreement.

The parties endowed the commissioner with wide powers and discretion . . . to observe, investigate and take such action as necessary to secure observance of the provisions of the agreements and rules, promotion of the expressed ideals of, and prevention of conduct detrimental to, baseball.

*Milwaukee American Assn. v. Landis, supra,* 49 F.2d at 301. Since the Commissioner has the authority to sanction that conduct that he concludes is detrimental to baseball, he must also have the authority to

issue advance notice as to what acts will constitute forbidden conduct. Essentially the directives served to warn that conduct inconsistent with the directives would be considered not in the best interests of baseball and would be severely dealt with. Accordingly, they were "preventive" measures, and the Commissioner had express authority to issue them.

Moreover, there is nothing in the Collective Bargaining Agreement to prevent the Commissioner from promulgating these directives. Plaintiff would argue that since the Collective Bargaining Agreement has its own tampering rule which does not expressly forbid indirect contact between clubs and free agents, the Commissioner cannot extend that rule to preclude such indirect contact. Defendant charges that the Commissioner would have such authority even if an indirect contact rule was inconsistent with the Collective Bargaining tampering rule, so long as the rights of players were not thereby infringed. The court need not decide the validity of defendant's argument since it concludes that a notice forbidding indirect contacts as to contract terms supports and is not inconsistent with the free agent tampering rule. Baseball is a highly visible sport; because of its vast media coverage, contract terms can be communicated as easily through the mass media as through private communications. Here, the Commissioner interpreted the intent of the Collective Bargaining Agreement's concern over tampering, and issued warnings against acts inconsistent with the tampering rule. In fact, the September 28 directive tracks the exact language of Article XVII(c)(3) of the Bargaining Agreement. That these directives were encouraged and approved by the Executive Council and the Player Relations Committee lends credence to defendant's position that the Commissioner's authority in this area was understood. The court therefore concludes that in issuing these warnings the Commissioner acted well within the scope of his authority.

*Authority to Decide the Case*

Plaintiffs argue that inasmuch as the Commissioner charged Turner with violating the terms of the Collective Bargaining Agreement, see 6, *supra*, the matter should have been submitted to the arbitration panel established under Article X of the Bargaining Agreement as the "exclusive remedy" for grievances under the Agreement. A grievance is described in relevant part as a

> complaint which involves the interpretation of, or compliance with, the provisions of any agreement between the Association and the Clubs or any of them, or any agreement between a Player and a Club
>
> . . . . .

Article X, § A(1)(a). In the instant case, Lurie filed a complaint with the Commissioner complaining of Turner's statements. His grievance against Turner was then investigated by the Commissioner. Although the grievance did involve an interpretation of the tampering rule under the Collective Bargaining Agreement, it was not the type of dispute for which the arbitration panel was established. The clear intent of the arbitration provision and the Collective Bargaining Agreement in general was to settle disputes between player and club, not club and club, or club and Commissioner, as was the case here.

The Commissioner's authority to investigate and decide the case against Turner came not from the Bargaining Agreement, but from Article I, § 2, of the Major League Agreement, where he is given the power to determine what conduct is not in the best interests of baseball. There is nothing in the Bargaining Agreement to prevent him from concluding that conduct which he views as violating the Collective Bargaining Agreement is also not in the best interests of baseball.

However, Turner next argues that his conduct was *not in contravention of the Commissioner's directives* since such directives only precluded indirect contacts with *potential* free agents prior to the end of the season and negotiation of contract terms with actual free agents after the season. Plaintiffs claim that the evidence

adduced at the hearing clearly established that Turner did not negotiate terms with Matthews, and that his conduct did not have the effect of subverting the draft as the Commissioner concluded. Accordingly, plaintiffs argue that the Commissioner's decision was contrary to the weight of the evidence and that he abused his discretion and violated the mandates of natural justice in disciplining Turner.

In the Commissioner's first directive he stressed the fact that comments to the press may have the same effect as direct communication with a player. Although the September 28 directive only explicitly warned against indirect contacts during the season, the court must conclude that when all of the directives are read together, they give fair warning that commenting to the media concerning the price to be paid for a player is forbidden conduct. True, the Commissioner possibly overstates his case when he says in his order that Turner's remarks "clearly had the effect of subverting the Collective Bargaining Agreement and the re-entry draft procedures." So far as the evidence discloses this simply is not correct. The draft, so far as appears, went smooth as silk, though the remarks may have convinced San Francisco of the futility of trying to hold its player, Matthews. But however this may be, the remarks certainly displayed a real potential for subverting re-entry drafts both then and in the future; and, according to the evidence, it was this potential to which the Commissioner referred and which he wished to forever entomb.

In any event, the court must hold in check a close scrutiny of the reasons given for the Commissioner's decision to discipline Turner. The Commissioner has general authority, without rules or directives, to punish both clubs and/or personnel for any act or conduct which, in his judgment, is "not in the best interests of baseball" within the meaning of the Major League Agreement. What conduct is "not in the best interests of baseball" is, of course, a question which addresses itself to the Commissioner, not this court. He has made his finding that Turner's conduct was of this character. The court knows of no authority which prevented him from making it, and cannot say his decision was either arbitrary or wrong. There is no evidence that the Commissioner's decision was the result of bias or ill will, although, during the same period one other tampering violation was dealt with much less severely. The court therefore concludes, with some misgivings, that under this provision, the Commissioner did have authority to punish plaintiffs.

*The Sanctions*

■ Viewing the evidence concerning punishment here, a casual, nonlegalistic observer might say that this case represents a comedy of strange tactical errors on both sides. Both at the hearing before the Commissioner and afterward, but before decision, Turner asked for "suspension" as his punishment in lieu of cancellation of the Matthews contract, which he feared. The Commissioner also did some inexplicable things: He approved Atlanta's signing of Matthews, apparently the only tangible mischief resulting from Turner's remarks, but having approved the act of signing he then punished Turner for publicly suggesting in advance he intended to do it. He also forbade Turner the right to manage his business or to even go on his own property except as a paying customer.[4] The Atlanta Baseball Club is called the "Atlanta Braves"; and considering the severity of this punishment, the same casual observer might call this an Indian massacre in reverse. In their encounter with the Commissioner the Braves took "nary" a scalp,[5] but lived to see their own dangling from the lodgepole of the Commissioner, apparently only as a grisly warning to others. At about the same time and for an identical offense, though perhaps not as flagrant, the venerable owner of the St. Louis Cardinals

4. The Commissioner did suggest from the stand that he didn't think Turner would be required to pay admission fees to see the games.

5. Except, of course, the Matthews contract.

was fined $5,000.[6] All of which adds nothing to the *legal* power of this court to extricate plaintiffs from a suspension which they invited and to which they assented, both orally and contractually.

Plaintiffs say, however, that the suspension of Turner here amounted to an abuse of discretion. It has been suggested that an "abuse of discretion" is the virtual equivalent of an error of law. *Black's Law Dictionary.* Other cases say that the exercise of an honest judgment, however erroneous it may appear to be, is not an abuse of discretion, especially where there are a large number of facts and "the facts themselves largely define the wisdom of the discretion . . . ." *Weeks v. Bareco Oil Co.,* 125 F.2d 84, 93 (7th Cir. 1941); *In re A. Roth Co., Inc.,* 125 F.2d 396, 398 (7th Cir. 1942).

Here the Commissioner could properly conclude that this was the second instance of improper conduct with respect to one player. He could also consider that Turner's comments were made after six warning directives had been issued, one of which cautioned that suspensions would follow from tampering violations. None of these aggravating circumstances were present in the St. Louis case. With these differences present, honest minds could, and indeed do, disagree as to what is an appropriate punishment. The court, therefore, simply cannot say the Commissioner abused his discretion. In Article VII, § 2, of the Major League Agreement the clubs explicitly agreed to be bound by the discipline imposed by the Commissioner and obviously intended to give him a certain amount of leeway to choose the appropriate sanction. Judicial review of every sanction imposed by the Commissioner would produce an unworkable system that the Major League Agreement endeavors to prevent. Here, Turner was warned of the suspension, he

asked for the suspension, the contract specifically authorized it, and he got it.

■ The denial of the June draft choice, however, stands on a somewhat different legal footing. Under the best interests of baseball clause, Article I, § 2, the Commissioner is given the authority to "determine, after investigation, what *preventive, remedial or punitive action* is appropriate in the premises." (Emphasis added.) Those punitive measures which the Commissioner may take are explicitly enumerated in Article I, § 3:

> In the case of conduct by Major Leagues, Major League Clubs, officers, employees or players which is deemed by the Commissioner not to be in the best interests of Baseball, action by the Commissioner for each offense may include any one or more of the following: (a) a reprimand; (b) deprivation of a Major League Club of representation in joint meetings; (c) suspension or removal of any officer or employee of a Major League or a Major League Club; (d) temporary or permanent ineligibility of a player; and (e) a fine, not to exceed Five Thousand Dollars ($5,000.00) in the case of a Major League Club and not to exceed Five Hundred Dollars ($500.00) in the case of any officer, employee or player.

Denial of a draft choice is simply not among the penalties authorized for this offense.

Defendant argues, however, that the list of sanctions enumerated in this section is intended to be only illustrative rather than definitive, as indicated by use of the language that penalties "*may* include any one or more of the following."[7] (Emphasis added.) Thus he says that the listing of specific sanctions in § 3 does not preclude the Commissioner from imposing other sanctions that he deems appropriate. He says that *Milwaukee American Ass'n. v.*

---

**6.** It may have been the disparity between these two sentences which landed the case in this court. Disparate sentences between two persons found guilty of the same offense, unless carefully explained and justified, always provoke resentment and distrust among the victims, whether in prison or baseball.

**7.** *Cf. Lowe v. Feldman,* 11 Misc.2d 8, 168 N.Y. S.2d 674, 684 (1957), wherein the court construed the term "may" in its "primary and most common use" as "giving permission to perform the act referred to."

*Landis, supra,* so holds. The court does not perceive *Landis* as going that far. In *Landis,* the Commissioner had found that the owner of the St. Louis Club, in his handling of a player under contract to that club, had engaged in conduct claimed to be not in the best interests of baseball. As a sanction, the Commissioner declared the player to be a free agent. The St. Louis Club argued that the Commissioner lacked authority to impose the sanction since it was not specifically listed in Article I, § 3. Although the court affirmed the action of the Commissioner and in doing so noted his wide range of powers, the question raised by the St. Louis Club in *Landis* and by the plaintiffs herein was left unanswered:

> [W]hether there is given to the commissioner the power in so many words to declare Bennett a free agent is immaterial, since the agreements and rules grant to the commissioner jurisdiction to refuse to approve Bennett's assignment by St. Louis to Milwaukee, and to declare him absolved from the burdens of the same and of his contract with St. Louis.

49 F.2d at 302. Since the Commissioner had the explicit authority to accomplish the same result by simply refusing to approve the contract, thereby automatically making Bennett a free agent (now under Rule 12(a) of the Major League Rules), there was no need to expand the sanctions listed in § 3 to include this measure.

■ The recent case of *Finley & Co. v. Kuhn,* 76C–2358 (N.D.Ill.1977), also did not decide the question of whether the sanctions listed in § 3 are exclusive, although defendant would suggest otherwise. The issue in *Finley* was again the Commissioner's authority to disapprove certain assignments as not being in the best interests of baseball. Although the court noted that the power to set aside assignments of players was not explicitly listed in the Commissioner's powers under § 3, it stated that

> Section 3 does not say that the Commissioner shall have *only* the power to act in the enumerated ways, though that could have been said if it was intended. The section says that the Commissioner *may* act in one of the enumerated ways, without expressly so limiting him.[8]

Judgment Order at 4. Although this language tends to support the Commissioner's argument, the court does not end its analysis there. The court continues:

> The question arises whether this enumeration of sanctions which the Commissioner might impose invokes the established rules of construction that the specific controls the general, and that the expression of a type or types of authority operates to exclude the conclusion that other and different types of authority were intended to be conferred.[9]

The court goes on to observe that the enumerated sanctions are "punitive" in nature, and although the Commissioner is empowered under § 2 to take what remedial, preventive or punitive measures he deems appropriate, there is no comparable list of "remedial" or "preventive" actions he is empowered to take. "Obviously such a list would be impossible to draw in the face of the unpredictability of the problems which might arise." Judgment Order at 4–5. In concluding that the Commissioner did have the authority to cancel certain assignments, the court seems to imply that whether or not the Commissioner is limited in the punitive sanctions he may impose, he is not similarly limited in the preventive or remedial measures available to him.

---

8. The court must confess bewilderment at the *Finley* court's extensive discussion of the Commissioner's authority under §§ 2 and 3 of the Major League Agreement, when the Commissioner was given express authority under Major League Rule 12(a) to take the action which was challenged in *Finley.*

9. As Judge McGarr notes in *Finley,* basic principles of contract construction state that the specific controls the general, such that the enumeration of specific items will limit the application of a general provision to areas not inconsistent with the specific terms. *See, e. g., Phillips v. Houston Natl. Bank,* 108 F.2d 934, 936 (5th Cir. 1940); *Federal Ins. Co. v. American Export Lines,* 113 F.Supp. 540, 543 (S.D.N.Y. 1953); *Savannah v. Savannah Electric & Power Co.,* 205 Ga. 429, 436–37, 54 S.E.2d 260 (1949); *American League Baseball Club v. Johnson,* 109 Misc. 138, 179 N.Y.S. 498, 502 (1919). *See generally* 17A Corpus Juris 2d, §§ 312, 313.

Other provisions of the Major League Agreement and the Major League Rules support plaintiffs' position that the Commissioner is limited in his authority to take punitive measures. For example, Article I, § 2(a), gives the Commissioner the authority "to summon persons and to order the production of documents, and, in the case of refusal to appear or produce, to impose such *penalties* as are hereinafter provided." The reference in § 2(a) to "penalties" presumably refers to those enumerated sanctions in § 3, since there is no further reference in the agreement to penalties for failure to appear or produce. In addition, Rule 50, "Enforcement of Major League Rules", provides in relevant part:

> (a) PENALTIES. In case the Commissioner shall determine that a league or club has violated any of the foregoing Rules, *as to which penalty provisions are not otherwise set forth in the Major League Agreement or Major League Rules*, the Commissioner may impose a fine or, in case of a club, may suspend the benefit of any or all of these Rules as to such club for a period not exceeding thirty (30) days. [Emphasis added.]

The implication of this provision is that the sum total of punitive sanctions available to the Commissioner are those specifically itemized in the Major League Agreement, Article I, § 3, or under the Major League Rules such as Rule 50.

▋ Thus, the language of the Major League Agreement and Major League Rules seems to imply that the list of sanctions in § 3 is exclusive, and basic rules of contract construction support this conclusion. Prior to the original Major League Agreement, there were no presumed powers vested in a Commissioner. The 1921 agreement created the office of the Commissioner and defined his powers out of whole cloth. In such a situation, the maxim *"Expressio unius est exclusio alterius"*[10] is particularly applicable, *Dorris v. Center,* 284 Ill.App. 344, 1 N.E.2d 794, 795 (1936). Moreover, in light of the fact that this contract purports to authorize the imposition of a penalty or forfeiture, it must be strictly construed, 17A *Corpus Juris* 2d § 320.

Set against this background are numerous instances where the Commissioner has taken action that was not listed in § 3, and testimony on the part of certain parties to the Major League Agreement which indicates that the intention of § 3 was to provide an illustrative list of sanctions available to the Commissioner. The court has little trouble with the numerous instances defendant cites where a Commissioner has declared a player to be a free agent. While the Commissioner may have believed that he was acting pursuant to an unlimited sanction authority, he nevertheless had the explicit authority to disapprove contracts and therefore render players free agents. *See Milwaukee American Ass'n. v. Landis, supra,* 49 F.2d at 304; Rule 12(a) of the Major League Rules.

In other instances, however, the Commissioner has taken action which falls outside the enumerated sanctions and which did not involve the disapproval of contracts. Plaintiffs would argue that in these instances, the Commissioner was acting pursuant to his remedial and preventive powers, whereas here he was utilizing his punitive powers. However, at times the distinction between what is remedial and what is punitive is difficult to decipher, since a remedial action in favor of one party will often serve as a punishment to another. Defendant argues that in the instant situation, the deprivation of a draft choice was also a remedial measure which reduced an unfair competitive advantage that Atlanta gained in signing Matthews. The trouble with this argument is that unlike most remedial situations where relief is afforded to the party injured by the wrongful conduct, here the only party which may have been injured, the San Francisco club, received no relief at all.

In any event, the court need not decide whether the Commissioner acted within his authority in those instances which are not

10. *See* note 9, *supra.*

now before the court. That the Commissioner's authority in those cases went unchallenged does not persuade this court of the Commissioner's unlimited punitive powers in light of contractual language and established rules of construction to the contrary, *see American League Baseball Club v. Johnson, supra,* 179 N.Y.S. at 505. If the Commissioner is to have the unlimited punitive authority as he says is needed to deal with new and changing situations, the agreement should be changed to expressly grant the Commissioner that power. The deprivation of a draft choice was first and foremost a punitive sanction, and a sanction that is not specifically enumerated under § 3. Accordingly, the court concludes that the Commissioner was without the authority to impose that sanction, and its imposition is therefore void.

*Tortious Interference*

 In light of the foregoing conclusions, the court must finally consider whether the Commissioner's actions constituted tortious interference with plaintiffs' business. An intentional interference with existing contractual relations of another is usually considered prima facie sufficient for liability, the burden shifting to the defendant to show that such interference was privileged or justified. *Prosser, The Law of Torts* (4th ed. 1971) at 942. The court has little trouble concluding that, with the exception of the deprivation of the draft choice, defendant's conduct was justified. The defendant acted within the scope of his authority, and indeed, was executing his assigned duties as Commissioner. Defendant's liability in tort for the draft choice sanction is slightly more difficult since the imposition of that sanction was ultra vires. However, inasmuch as the June draft has yet to be held, and plaintiffs' draft choice is being restored by order of this court, it now appears that plaintiffs have suffered no injury with respect to this sanction.

*Summary*

In summary, the Commissioner's decision to deprive plaintiffs of their first round draft choice in the June, 1977 amateur draft is hereby HELD to be ultra vires and therefore VOID. With respect to the balance of plaintiffs' claims, the court CONCLUDES that the Commissioner acted within the scope of his authority and hereby AWARDS judgment in favor of defendant. Each party is to bear its own costs in this action.