**CHARLES O. FINLEY & CO., INC.,**
Plaintiff-Appellant,

v.

**Bowie K. KUHN et al.,**
Defendants-Appellees.*

No. 77–2008.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 23, 1978.

Decided April 7, 1978.

* *Editor's Note:* The opinion of the United States Court of Appeals, Ninth Circuit, in *United States v. Giese,* published in the advance sheets at this citation (569 F.2d 527) has been withdrawn from the volume at the request of the court because rehearing is pending.

Neil Papiano, Donald M. Robbins, John A. Slezak, Los Angeles, Cal., for plaintiff-appellant.

James E. S. Baker, Lee B. McTurnan, Chicago, Ill., Peter K. Bleakley, Irvin B. Nathan, Paul S. Reichler, Washington, D. C., James P. Garner, Cleveland, Ohio, Louis L. Hoynes, Jr., New York City, Theodore A. Livingston, Jr., Chicago, Ill., Jesse Climenko, New York City, Stephen C. Shamberg, Chicago, Ill., for defendants-appellees.

Before FAIRCHILD, Chief Judge, SPRECHER and TONE, Circuit Judges.

SPRECHER, Circuit Judge.

The two important questions raised by this appeal are whether the Commissioner of baseball is contractually authorized to disapprove player assignments which he finds to be "not in the best interests of baseball" where neither moral turpitude nor violation of a Major League Rule is involved, and whether the provision in the Major League Agreement whereby the parties agree to waive recourse to the courts is valid and enforceable.

I

The plaintiff, Charles O. Finley & Co., Inc., an Illinois corporation, is the owner of the Oakland Athletics baseball club, a member of the American League of Professional Baseball Clubs (Oakland). Joe Rudi, Rollie Fingers and Vida Blue were members of the active playing roster of the Oakland baseball club and were contractually bound to play for Oakland through the end of the 1976 baseball season. On or about June 15, 1976, Oakland and Blue entered a contract whereby Blue would play for Oakland through the 1979 season, but Rudi and Fin-

gers had not at that time signed contracts for the period beyond the 1976 season.

If Rudi and Fingers had not signed contracts to play with Oakland by the conclusion of the 1976 season, they would at that time have become free agents eligible thereafter to negotiate with any major league club,[1] subject to certain limitations on their right to do so that were then being negotiated by the major league clubs with the Players Association.[2]

On June 14 and 15, 1976, Oakland negotiated tentative agreements to sell the club's contract rights for the services of Rudi and Fingers to the Boston Red Sox for $2 million and for the services of Blue to the New York Yankees for $1.5 million. The agreements were negotiated shortly before the expiration of baseball's trading deadline at midnight on June 15, after which time Oakland could not have sold the contracts of these players to other clubs without first offering the players to all other American League teams, in inverse order of their standing, at the stipulated waiver price of $20,000.

The defendant Bowie K. Kuhn is the Commissioner of baseball (Commissioner), having held that position since 1969. On June 18, 1976, the Commissioner disapproved the assignments of the contracts of Rudi, Fingers and Blue to the Red Sox and Yankees "as inconsistent with the best interests of baseball, the integrity of the game and the maintenance of public confidence in it." The Commissioner expressed his concern for (1) the debilitation of the Oakland club, (2) the lessening of the competitive balance of professional baseball through the buying of success by the more affluent clubs, and (3) "the present unsettled circumstances of baseball's reserve system."

Thereafter on June 25, 1976, Oakland instituted this suit principally challenging, as beyond the scope of the Commissioner's authority and, in any event, as arbitrary and capricious, the Commissioner's disapproval of the Rudi, Fingers and Blue assignments. The complaint set forth seven causes of action: (I) that the Commissioner breached his employment contract with Oakland by acting arbitrarily, discriminatorily and unreasonably; (II) that the Commissioner, acting in concert with others, conspired to eliminate Oakland from baseball in violation of federal antitrust laws; (III) that Oakland's constitutional rights of due process and equal protection were violated; (IV) that Oakland's constitutional rights were violated by the first disapproval of a player assignment where no major league rule was violated; (V) that the defendants (the Commissioner, the National and American Leagues and the Major League Executive Council) induced the breach of Oakland's contracts with Boston and New York; (VI) that the Commissioner did not have the authority to disapprove Oakland's assignments "in the best interests of baseball"; and (VII) that Oakland have specific performance of its contracts of assignment with Boston and New York.

On September 7, 1976, the district court granted the Commissioner's motion for summary judgment as to Counts II, III and IV. Count II was dismissed on the ground that the business of baseball is not subject to the federal antitrust laws. Counts III and IV were dismissed on the ground that Oakland did not allege sufficient nexus between the state and the complained of activity to constitute state action.

A bench trial took place as a result of which judgment on the remaining four counts of the complaint was entered in favor of the Commissioner on March 17, 1977.

1. On December 23, 1975, an arbitration panel under the 1973 collective bargaining agreement between the baseball club owners and the Players Association had held that players Andy Messersmith and Dave McNally were free agents able to negotiate with clubs other than those to which they had previously been contractually bound. On February 11, 1976, the district court ordered the award of the arbitra-

tion panel enforced in *Kansas City Royals Baseball Corp. v. Major League Baseball Players Ass'n,* 409 F.Supp. 233 (W.D.Mo.). On March 9, 1976, the Court of Appeals for the Eighth Circuit affirmed the district court in 532 F.2d 615.

2. Finding of Fact 9. *See also* footnote 26 *infra.*

On August 29, 1977, the district court granted the Commissioner's counterclaim for a declaratory judgment that the covenant not to sue in the Major League Agreement is valid and enforceable. The court had not relied on that covenant in reaching its two earlier decisions.

Oakland appealed from the judgments of September 7, 1976, March 17, 1977, and August 29, 1977, arguing (1) that the court's failure to issue a finding on the question of procedural fairness constituted error; (2) that the exclusion of evidence of the Commissioner's malice toward the Oakland club constituted error; (3) that other errors were committed during trial; (4) that the antitrust count was not barred by baseball's exemption from federal antitrust law; and (5) that baseball's blanket waiver of recourse to the courts is not enforceable.

## II

Basic to the underlying suit brought by Oakland and to this appeal is whether the Commissioner of baseball is vested by contract with the authority to disapprove player assignments which he finds to be "not in the best interests of baseball." In assessing the measure and extent of the Commissioner's power and authority, consideration must be given to the circumstances attending the creation of the office of Commissioner, the language employed by the parties in drafting their contractual understanding, changes and amendments adopted from time to time, and the interpretation given by the parties to their contractual language throughout the period of its existence.

Prior to 1921, professional baseball was governed by a three-man National Commission formed in 1903 which consisted of the presidents of the National and American Leagues and a third member, usually one of the club owners, selected by the presidents of the two leagues.[3] Between 1915 and 1921, a series of events and controversies contributed to a growing dissatisfaction with the National Commission on the part of players, owners and the public, and a demand developed for the establishment of a single, independent Commissioner of baseball.[4]

On September 28, 1920, an indictment issued charging that an effort had been made to "fix" the 1919 World Series by several Chicago White Sox players. Popularly known as the "Black Sox Scandal," this event rocked the game of professional baseball and proved the catalyst that brought about the establishment of a single, neutral Commissioner of baseball.[5]

In November, 1920, the major league club owners unanimously elected federal Judge Kenesaw Mountain Landis as the sole Commissioner of baseball and appointed a committee of owners to draft a charter setting forth the Commissioner's authority. In one of the drafting sessions an attempt was made to place limitations on the Commissioner's authority. Judge Landis responded by refusing to accept the office of Commissioner.[6]

On January 12, 1921, Landis told a meeting of club owners that he had agreed to accept the position upon the clear understanding that the owners had sought "an authority . . . outside of your own business, and that a part of that authority would be a control over whatever and whoever had to do with baseball."[7] Thereupon, the owners voted unanimously to reject the proposed limitation upon the Commissioner's authority,[8] they all signed what they

3. Finding of Fact 13. *See* 2 Seymour, Baseball: The Golden Age (1971) 9–18.

4. Finding of Fact 13. *See also* 2 Seymour, *supra* footnote 3, at 18, 259–273.

5. Finding of Fact 14. *See* Asinof, Eight Men Out: The Black Sox and the 1919 World Series (1963).

6. Findings of Fact 17, 18.

7. Finding of Fact 18.

8. Finding of Fact 19. In Spink, Judge Landis and Twenty-Five Years of Baseball (1947) 72, the author says that "Landis agreed to accept if he was given absolute control over baseball."

called the Major League Agreement, and Judge Landis assumed the position of Commissioner. Oakland has been a signatory to the Major League Agreement continuously since 1960.[9] The agreement, a contract between the constituent clubs of the National and American Leagues, is the basic charter under which major league baseball operates.[10]

The Major League Agreement provides that "[t]he functions of the Commissioner shall be . . . to investigate . . . any act, transaction or practice . . . not in the best interests of the national game of Baseball" and "to determine . . what preventive, remedial or punitive action is appropriate in the premises, and to

take such action . . . ." Art. I, Sec. 2(a) and (b).[11]

The Major League Rules, which govern many aspects of the game of baseball, are promulgated by vote of major league club owners.[12] Major League Rule 12(a) provides that "no . . . [assignment of players] shall be recognized as valid unless . . . approved by the Commissioner." [13]

The Major Leagues and their constituent clubs severally agreed to be bound by the decisions of the Commissioner and by the discipline imposed by him. They further agreed to "waive such right of recourse to the courts as would otherwise have existed in their favor." Major League Agreement, Art. VII, Sec. 2.[14]

---

9. Finding of Fact 3. *See also* Finding of Fact 29.

10. Finding of Fact 5.

11. Art. I, Sec. 2 provides in part:
 The functions of the Commissioner shall be as follows:
 (a) TO INVESTIGATE, either upon complaint or upon his own initiative, any act, transaction or practice charged, alleged or suspected to be not in the best interests of the national game of Baseball, with authority to summon persons and to order the production of documents, and, in case of refusal to appeal or produce, to impose such penalties as are hereinafter provided.
 (b) TO DETERMINE, after investigation, what preventive, remedial or punitive action is appropriate in the premises, and to take such action either against Major Leagues, Major League Clubs or individuals, as the case may be.
 This language is identical to Art. I, Sec. 2(a) and (b) as originally executed on January 12, 1921, with the exception that the words in present paragraph (a) "not in the best interests of the national game of Baseball" were originally "detrimental to the best interests of the national game of baseball." The change was made in 1964. The district court implied that the change broadened the Commissioner's powers when it found that "previously the Commissioner had to find conduct 'detrimental' to the best interests of baseball in order to take remedial or preventive action . . . ." Finding of Fact 28.

12. Finding of Fact 7.

13. Finding of Fact 39. A rule of this nature was in effect at least as early as 1931. In *Milwaukee American Ass'n v. Landis,* 49 F.2d 298, 302 (N.D.Ill.1931), the court noted that "[w]hether there is given to the commissioner the power in so many words to declare Bennett a free agent is immaterial, since the agreements and rules grant to the commissioner jurisdiction to refuse to approve Bennett's assignment by St. Louis to Milwaukee, and to declare him absolved from the burdens of the same and of his contract with St. Louis."
 A federal district judge in another case has expressed his opinion that the present case was correctly decided by the district court on the sole ground that the Commissioner was given specific authority under Major League Rule 12(a) to disapprove contracts and therefore render players free agents. *Atlanta National League Baseball Club, Inc. v. Kuhn,* 432 F.Supp. 1213, 1224 (fn. 8), 1225 (N.D.Ga.1977).

14. Art. VII, Sec. 2 provides:
 The Major Leagues and their constituent clubs, severally agree to be bound by the decisions of the Commissioner, and the discipline imposed by him under the provisions of this Agreement, and severally waive such right of recourse to the courts as would otherwise have existed in their favor.
 This language is identical to Art. VII, Sec. 1 in the original 1921 agreement. Also, on the same day, January 12, 1921, that the Major League Agreement was signed on behalf of the two major leagues and sixteen baseball clubs, the league presidents and club presidents individually signed the following "Pledge to Support the Commissioner":
 We, the undersigned, earnestly desirous of insuring to the public wholesome and high-

Upon Judge Landis' death in 1944, the Major League Agreement was amended in two respects to limit the Commissioner's authority. First, the parties deleted the provision by which they had agreed to waive their right of recourse to the courts to challenge actions of the Commissioner.[15] Second, the parties added the following language to Article I, Section 3:

> No Major League Rule or other joint action of the two Major Leagues, and no action or procedure taken in compliance with any such Major League Rule or joint action of the two Major Leagues shall be considered or construed to be detrimental to Baseball.

The district court found that this addition had the effect of precluding the Commissioner from finding an act that complied with the Major League Rules to be detrimental to the best interests of baseball.[16]

The two 1944 amendments to the Major League Agreement remained in effect during the terms of the next two Commissioners, A. B. "Happy" Chandler and Ford Frick.[17] Upon Frick's retirement in 1964 and in accordance with his recommendation, the parties adopted three amendments to the Major League Agreement: (1) the language added in 1944 preventing the Commissioner from finding any act or practice "taken in compliance" with a Major League Rule to be "detrimental to baseball" was removed;[18] (2) the provision deleted in 1944 waiving any rights of recourse to the courts to challenge a Commissioner's decision was restored;[19] and (3) in places where the language "detrimental to the best interests of the national game of baseball" or "detrimental to baseball" appeared those words were changed to "not in the best interests of the national game of Baseball" or "not in the best interests of Baseball."[20]

The nature of the power lodged in the Commissioner by the Major League Agreement is further exemplified "[i]n the case of conduct by organizations not parties to this Agreement, or by individuals not connected with any of the parties hereto, which is deemed by the Commissioner not to be in the best interests of Baseball" whereupon "the Commissioner may pursue appropriate legal remedies, advocate remedial legislation and take such other steps as he may deem necessary and proper in the interests of the morale of the players and the honor of the game." Art. I, Sec. 4.[21]

The Commissioner has been given broad power in unambiguous language to investigate any act, transaction or practice not in the best interests of baseball, to determine what preventive, remedial or punitive action is appropriate in the premises, and to take that action. He has also been given the express power to approve or disapprove the assignments of players. In regard to nonparties to the agreement, he may take such other steps as he deems necessary and proper in the interests of the morale of the players and the honor of the game. Fur-

---

class baseball, and believing that we ourselves should set for the players an example of the sportsmanship which accepts the umpire's decision without complaint, hereby pledge ourselves loyally to support the Commissioner in his important and difficult task; and we assure him that each of us will acquiesce in his decisions even when we believe them mistaken, and that we will not discredit the sport by public criticism of him or of one another.

15. The last part of Art. VII, Sec. 2. Footnote 14 *supra.* The parties retained the first part of the section wherein they agreed to be bound by the decisions of the Commissioner and the discipline imposed by him.

16. Finding of Fact 22.

17. Finding of Fact 23.

18. Finding of Fact 26.

19. Finding of Fact 27.

20. Finding of Fact 28. *See* footnote 11 *supra.*

21. The original 1921 agreement contained substantially the same language except it included the words "conduct detrimental to baseball" instead of "not to be in the best interests of Baseball." *See* footnote 11 *supra.* There is a reference to Article I, Section 4 in *Milwaukee American Ass'n v. Landis,* 49 F.2d 298, 299 (N.D.Ill.1931).

ther, indicative of the nature of the Commissioner's authority is the provision whereby the parties agree to be bound by his decisions and discipline imposed and to waive recourse to the courts.

The Major League Agreement also provides that "[i]n the case of conduct by Major Leagues, Major League Clubs, officers, employees or players which is deemed by the Commissioner not to be in the best interests of Baseball, action by the Commissioner for each offense *may include*" a reprimand, deprivation of a club of representation at joint meetings, suspension or removal of non-players, temporary or permanent ineligibility of players, and a fine not to exceed $5,000 in the case of a league or club and not to exceed $500 in the case of an individual. Art. I, Sec. 3.[22]

The district court considered the plaintiff's argument that the enumeration in Article I, Section 3 [23] of the sanctions which the Commissioner may impose places a limit on his authority inasmuch as the power to disapprove assignments of players is not included. The court concluded that the enumeration does not purport to be exclusive and provides that the Commissioner *may* act in one of the listed ways without expressly limiting him to those ways.

The court further concluded that the principles of construction that the specific controls the general, or that the expression of some kinds of authority operates to exclude unexpressed kinds, do not apply since the Commissioner is empowered to determine what preventive, remedial or punitive action is appropriate in a particular case and the listed sanctions are punitive only.[24] In fact, from 1921 until 1964, Article I, Section 3, expressly described the enumerated sanctions as "punitive action." [25]

■ In view of the broad authority expressly given by the Major League Agreement to the Commissioner, particularly in Section 2 of Article I, we agree with the district court that Section 3 does not purport to limit that authority.

### III

Despite the Commissioner's broad authority to prevent any act, transaction or practice not in the best interests of baseball, Oakland has attacked the Commissioner's disapproval of the Rudi-Fingers-Blue transactions on a variety of theories which seem to express a similar thrust in differing language.

The complaint alleged that the "action of Kuhn was arbitrary, capricious, unreasonable, discriminatory, directly contrary to historical precedent, baseball tradition, and prior rulings and actions of the Commissioner." In pre-trial answers to interrogatories, Oakland acknowledged that the Commissioner could set aside a proposed assignment of a player's contract "in an appropriate case of violation of [Major

---

**22.** Art. I, Sec. 3 provides:
> In the case of conduct by Major League Clubs, officers, employees or players which is deemed by the Commissioner not to be in the best interests of Baseball, action by the Commissioner for each offense may include any one or more of the following: (a) a reprimand; (b) deprivation of a Major League Club of representation in joint meetings; (c) suspension or removal of any officer or employee of a Major League Club; (d) temporary or permanent ineligibility of a player; and (e) a fine, not to exceed Five Thousand Dollars ($5,000.00) in the case of a Major League or a Major League Club and not to exceed Five Hundred Dollars ($500.00) in the case of any officer, employee or player.
>
> The original 1921 agreement was substantially the same except that until 1964(1) it used the phrase "in the case of conduct detrimental to baseball," see footnote 11 *supra;* (2) it described the enumerated forms of action as "punitive action"; and (3) the possibility of assessing a fine against an individual of up to $500 did not appear in the agreement until 1964.

**23.** *See* footnote 22 *supra.*

**24.** The district court said in its judgment order of March 17, 1977: "Nowhere in the Agreement is there a comparable list of the 'preventative' or 'remedial' actions he is empowered to take. Obviously such a list would be impossible to draw in the face of the unpredictability of the problems which arise."

**25.** *See* footnote 22 *supra.*

League] Rules or immoral or unethical conduct."

It is clear from reading the findings of fact that the district court determined through the course of the trial that Oakland was contending that the Commissioner could set aside assignments only if the assignments involved a Rules violation or moral turpitude.

In its briefs on appeal, Oakland summarized this branch of its argument by stating that the Commissioner's "disapproval of the assignments . . . exceeded [his] authority under the Major League Agreement and Rules; was irrational and unreasonable; and was procedurally unfair." The nub of this diffuse attack seems best expressed in a subsequent heading in the brief that the Commissioner's "abrupt departure from well-established assignment practice and his retroactive application of this change of policy to disapprove [Oakland's] assignments was made without reasonable notice and was therefore procedurally unfair."

The plaintiff has argued that it is a fundamental rule of law that the decisions of the head of a private association must be procedurally fair. Plaintiff then argued that it was "procedurally unfair" for the Commissioner to fail to warn the plaintiff that he would "disapprove large cash assignments of star players even if they complied with the Major League Rules."

In the first place it must be recalled that prior to the assignments involved here drastic changes had commenced to occur in the reserve system and in the creation of free agents.[26] In his opinion disapproving the Rudi, Fingers and Blue assignments, the Commissioner said that "while I am of course aware that there have been cash sales of player contracts in the past, there has been no instance in my judgment which had the potential for harm to our game as do these assignments, particularly in the present unsettled circumstances of baseball's reserve system and in the highly competitive circumstances we find in today's sports and entertainment world."

Absent the radical changes in the reserve system, the Commissioner's action would have postponed Oakland's realization of value for these players.[27] Given those changes, the relative fortunes of all major league clubs became subject to a host of intangible speculations. No one could predict then or now with certainty that Oak-

26. The following description of the changes in the reserve system appears in *Atlanta National League Baseball Club, Inc. v. Kuhn*, 432 F.Supp. 1213, 1215 (N.D.Ga.1977):

This system, which essentially bound a player to a team perpetually unless traded or released, was known as the reserve system. In 1975, the Players Association filed grievances on behalf of two players, Andy Messersmith and Dave McNally, challenging this system. An arbitration panel considered the grievances and concluded that players who had completed their last year of a contract with a particular club would be obligated, at the option of the club, to play only one additional year for that club. Unless the player and club signed a new agreement during this option year, the player became a free agent, with the right to negotiate contract terms with other major league clubs at the end of the option year season. The decision of the arbitration panel was upheld by the Court of Appeals for the Eighth Circuit in *Kansas City Royals Baseball Corp. v. Major League Baseball Players Ass'n.*, 532 F.2d 615 (8th Cir. 1976).

In an effort to implement the *Kansas City Royals* decision, the representatives of the Players Association and the club owners met to hammer out a new collective bargaining agreement. An agreement was reached in July, 1976 which established a special reentry draft to be conducted in November of each year for those players who had become free agents at the end of a baseball season. Procedures were established for the November draft whereby negotiation rights with each free agent could be drafted by up to twelve teams, each of which were then given negotiation rights for that player. Between the end of the season and three days prior to the draft, however, only the club of record, the team for which the prospective free agent was playing out his option, had negotiation rights with that player.

27. This realization of value could come in the form of subsequent player transactions involving less cash but some returning-player value, or in box office profits attributable to these players, or possibly in the aggregate value of the club if and when eventually sold as a franchise and team.

land would fare better or worse relative to other clubs through the vagaries of the revised reserve system occurring entirely apart from any action by the Commissioner.

In the second place, baseball cannot be analogized to any other business or even to any other sport or entertainment. Baseball's relation to the federal antitrust laws has been characterized by the Supreme Court as an "exception," an "anomaly" and an "aberration."[28] Baseball's management through a commissioner is equally an exception, anomaly and aberration, as outlined in Part II hereof. In no other sport or business is there quite the same system, created for quite the same reasons and with quite the same underlying policies. Standards such as the best interests of baseball,[29] the interests of the morale of the players and the honor of the game,[30] or "sportsmanship which accepts the umpire's decision without complaint,"[31] are not necessarily familiar to courts and obviously require some expertise in their application. While it is true that professional baseball selected as its first Commissioner a federal judge,[32] it intended only him and not the judiciary as a whole to be its umpire and governor.

As we have seen in Part II, the Commissioner was vested with broad authority and that authority was not to be limited in its exercise to situations where Major League Rules or moral turpitude was involved. When professional baseball in-

tended to place limitations upon the Commissioner's powers, it knew how to do so. In fact, it did so during the 20-year period from 1944 to 1964.

The district court found and concluded that the Rudi-Fingers-Blue transactions were not, as Oakland had alleged in its complaint, "directly contrary to historical precedent, baseball tradition, and prior rulings." During his almost 25 years as Commissioner, Judge Landis found many acts, transactions and practices to be detrimental to the best interests of baseball in situations whether neither moral turpitude nor a Major League Rule violation was involved, and he disapproved several player assignments.[33]

On numerous occasions since he became Commissioner of baseball in February 1969, Kuhn has exercised broad authority under the best interests clause of the Major League Agreement. Many of the actions taken by him have been in response to acts, transactions or practices that involved neither the violation of a Major League Rule nor any gambling, game-throwing or other conduct associated with moral turpitude. Moreover, on several occasions Commissioner Kuhn has taken broad preventive or remedial action with respect to assignments of player contracts.[34]

On several occasions Charles O. Finley, the principal owner of the plaintiff corporation and the general manager of the Oakland baseball club, has himself espoused

---

**28.** *Flood v. Kuhn*, 407 U.S. 258, 282, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972).

**29.** Major League Agreement, Article I, Sections 2(a), 3, 4.

**30.** Major League Agreement, Article I, Section 4.

**31.** The original "Pledge to Support the Commissioner," *see* footnote 14 *supra*.

**32.** Judge Kenesaw Mountain Landis was 38 years old when President Theodore Roosevelt appointed him to the United States District Court for the Northern District of Illinois in 1905. When he accepted the office of Commissioner of baseball in November 1920, he continued in his judicial post which provoked heavy

criticism from Congress, the American Bar Association and the press. Landis finally sent his judicial resignation to President Harding in February 1922, to become effective March 1, after having held both positions for more than 15 months. He served as baseball Commissioner for almost 25 years until his death on November 25, 1944. 2 Voight, American Baseball (1970) 141–150; 2 Seymour Baseball: The Golden Age (1971) 367–372; Asinof, Eight Men Out: The Black Sox and the 1919 World Series (1963) 223–224; MacKenzie, The Appearance of Justice (1974) 180–182.

**33.** Finding of Fact 21.

**34.** Finding of Fact 30. For examples of such actions, see Findings of Fact 31, 32, 33, 34, 35, 36.

that the Commissioner has the authority to exercise broad powers pursuant to the best interests clause, even where there is no violation of the Major League Rules and no moral turpitude is involved.[35]

Twenty-one of the 25 parties to the current Major League Agreement who appeared as witnesses in the district court testified that they intended and they presently understand that the Commissioner of baseball can review and disapprove an assignment of a player contract which he finds to be not in the best interests of baseball, even if the assignment does not violate the Major League Rules and does not involve moral turpitude.[36] Oakland contended that the district court erred in admitting this testimony since parties are bound "only by their objective manifestations and their subjective intent is immaterial." In this bench trial where Oakland was contending that it was not put on notice that transactions alleged to otherwise conform to the Major League Rules might be invalidated, the court could certainly consider what most of the current parties to the agreement believed they were put on notice of when they became signatories.

Oakland relied upon Major League Rule 21, which deals, in Oakland's characterization of it, with "(a) throwing or soliciting the throwing of ball games, (b) bribery by or of players or persons connected with clubs or (c) umpires, (d) betting on ball games, and (e) physical violence and other unsportsmanlike conduct" as indicating the limits of what is "not in the best interests of baseball." However, Rule 21(f) expressly states:

Nothing herein contained shall be construed as exclusively defining or other-

wise limiting acts, transactions, practices or conduct not to be in the best interests of Baseball; and any and all other acts, transactions, practices or conduct not to be in the best interests of Baseball are prohibited, and shall be subject to such penalties including permanent ineligibility, as the facts in the particular case may warrant.

Oakland also took issue with language in the district court's judgment order of March 17, 1977, which relied upon *Milwaukee American Ass'n v. Landis,* 49 F.2d 298 (N.D.Ill.1931).[37] Oakland contended that the *Landis* case was distinguishable inasmuch as it involved the violation of a certain rule. In that case Judge Lindley held that the Commissioner "acted clearly within his authority" when he disapproved a player assignment after several assignments of the same player to and from different clubs owned by a single individual. The court said in 49 F.2d at 302:[38]

Though there is nothing in the rules to prohibit an individual owning control of a Major League club from likewise owning control of Minor League clubs, the intent of the code is such that common ownership is not to be made use of as to give one individual, controlling all of the clubs mentioned, the absolute right, independent of other clubs, to control indefinitely a player acquired and switched about by apparent outright purchases.

■ We conclude that the evidence fully supports, and we agree with, the district court's finding that "[t]he history of the adoption of the Major League Agreement in 1921 and the operation of baseball for more than 50 years under it, including: the

---

**35.** Finding of Fact 43. For examples of such occasions, see Findings of Fact 44, 45, 46.

**36.** Finding of Fact 37.

**37.** The district court said: "Many years ago, in the case of *Milwaukee American Association v. Landis,* . . . the court determined this same issue in this same manner. From that date to this, if the signatories to the Major League Agreement had wished to bar the Commissioner from their property rights in players'

contracts, it has always been and still remains within their power to do so. They have not."

**38.** The *Landis* court also said at 301: "The parties endowed the commissioner with wide power and discretion . . . of his own initiative to observe, investigate and take such action as necessary to secure observance of the provisions of the agreements and rules, promotion of the expressed ideals of, and prevention of conduct detrimental to baseball."

circumstances preceding and precipitating the adoption of the Agreement; the numerous exercises of broad authority under the best interests clause by Judge Landis and . . . Commissioner Kuhn; the amendments to the Agreement in 1964 restoring and broadening the authority of the Commissioner; . . . and most important the express language of the Agreement itself—are all to the effect that the Commissioner has the authority to determine whether *any* act, transaction or practice is 'not in the best interests of baseball,' and upon such determination, to take whatever preventive or remedial action he deems appropriate, whether or not the act, transaction or practice complies with the Major League Rules or involves moral turpitude." [39] Any other conclusion would involve the courts in not only interpreting often complex rules of baseball to determine if they were violated but also, as noted in the *Landis* case, the "intent of the [baseball] code," an even more complicated and subjective task.

The Rudi-Fingers-Blue transactions had been negotiated on June 14 and 15, 1976. On June 16, the Commissioner sent a teletype to the Oakland, Boston and New York clubs and to the Players' Association expressing his "concern for possible consequences to the integrity of baseball and public confidence in the game" and setting a hearing for June 17. Present at the hearing were 17 persons representing those notified. At the outset of the hearing the Commissioner stated that he was concerned that the assignments would be harmful to the competitive capacity of Oakland; that they reflected an effort by Boston and New York to purchase star players and "bypass the usual methods of player development and acquisition which have been traditionally used in professional baseball"; and that the question to be resolved was whether the transactions "are consistent with the best interests of baseball's integrity and maintenance of public confidence in the game." He warned that it was possible that he might determine that the assignments not be approved. Mr. Finley and representatives of the Red Sox and Yankees made statements on the record.

No one at the hearing, including Mr. Finley, claimed that the Commissioner lacked the authority to disapprove the assignments, or objected to the holding of the hearing, or to any of the procedures followed at the hearing. [40]

On June 18, the Commissioner concluded that the attempted assignments should be disapproved as not in the best interests of baseball. In his written decision, the Commissioner stated his reasons which we have summarized in Part I. The decision was sent to all parties by teletype. [41]

The Commissioner recognized "that there have been cash sales of player contracts in the past," but concluded that "these transactions were unparalleled in the history of the game" because there was "never anything on this scale or falling at this time of the year, or which threatened so seriously to unbalance the competitive balance of baseball." [42] The district court concluded that the attempted assignments of Rudi, Fingers and Blue "were at a time and under circumstances making them unique in the history of baseball." [43]

We conclude that the evidence fully supports, and we agree with, the district court's finding and conclusion that the Commissioner "acted in good faith, after investigation, consultation and deliberation, in a manner which he determined to be in the best interests of baseball" and that "[w]hether he was right or wrong is beyond the competence and the jurisdiction of this court to decide." [44]

---

39. Finding of Fact 47.

40. Finding of Fact 49.

41. Finding of Fact 50.

42. Finding of Fact 51; Tr. 1867.

43. Finding of Fact 52.

44. Finding of Fact 55. *See also* Finding of Fact 53:

It is beyond the province of this court to consider the wisdom of the Commissioner's reasons for disapproving the assignments of Rudi, Blue and Fingers. There is insufficient evidence, however, to support plaintiff's alle-

We must then conclude that anyone becoming a signatory to the Major League Agreement was put on ample notice that the action ultimately taken by the Commissioner was not only possible but probable. The action was neither an "abrupt departure" nor a "change of policy" in view of the contemporaneous developments taking place in the reserve system, over which the Commissioner had little or no control,[45] and in any event the broad authority given to the Commissioner by the Major League Agreement placed any party to it on notice that such authority could be used.

Oakland has argued that the district court erred in not finding on the issue of procedural fairness. To the extent that Oakland made this an issue during the course of the trial, the court responded with adequate findings, many of which we have discussed in this Part III.

Finally, Oakland has also argued that the court excluded evidence which tended to show the Commissioner's malice toward Mr. Finley. Finley's own testimony on this subject, as well as the Commissioner's deposition covering the subject, were admitted as part of the record. When counsel for the Commissioner attempted to cross-examine Finley in regard to the same subject, Oakland's counsel objected on the ground of relevancy and the court sustained the objection on the ground that the Commissioner's motivation was not a serious issue in the case.[46] When the Commissioner was being cross-examined the same objection was sustained. However, since the subject had not been covered in direct examination, the court in its discretion could restrict the cross-examination to the scope of the direct; and since the subject of malice and motivation had been covered in Finley's testimony and in the Commissioner's deposition, the court could exclude it as cumulative regardless of its relevancy. The court made an express finding that the Commissioner had not been motivated by malice.[47]

## IV

The district court granted the defendant's motion for summary judgment as to Count II of the complaint, which sought to establish a violation of the Sherman Antitrust Act. The court said that "Baseball, anomaly of the antitrust law, is not subject to the provisions of that Act." The plaintiff on appeal has argued that any exemption which professional baseball might enjoy from federal antitrust laws applies only to the reserve system.[48]

The reserve system "centers in the uniformity of player contracts; the confine-

---

gation that the Commissioner's action was arbitrary or capricious, or motivated by malice, ill will or anything other than the Commissioner's good faith judgment that these attempted assignments were not in the best interests of baseball. The great majority of persons involved in baseball who testified on this point shared Commissioner Kuhn's view.

45. Oakland has not expressly argued that the Commissioner's notice of hearing, the hearing itself, or his written decision with express reasons were procedurally unfair, but only that Oakland was not put on notice of a changed policy and that the Commissioner bore malice toward Finley.

46. Tr. 811:
 The Court: Well, it [motivation of the Commissioner] is one [allegation of the complaint] that the testimony thus far has not really supported and I don't think it is a serious allegation. I don't take it seriously.

I am not interested in whether the Commissioner likes Mr. Finley or whether he doesn't. If he had the authority to do what he did, we have a legal issue, and that is the only one I am going to look at, so I will sustain the objection.

47. Finding of Fact 53. *See* footnote 44 *supra*.

48. The plaintiff relies principally upon two quotations from Mr. Justice Blackmun's opinion for the Supreme Court in *Flood v. Kuhn*, 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972):
 For the third time in 50 years the Court is asked specifically to rule that professional baseball's reserve system is within the reach of the federal antitrust laws.
*Id.* at 259, 92 S.Ct. at 2100.
 With its reserve system enjoying exemption from the federal antitrust laws, baseball is, in a very distinct sense, an exception and an anomaly.
*Id.* at 282, 92 S.Ct. at 2112.

ment of the player to the club that has him under the contract; the assignability of the player's contract; and the ability of the club annually to renew the contract unilaterally, subject to a stated salary minimum." [49]

The Supreme Court has held three times that "the business of baseball" is exempt from the federal antitrust laws.

In *Federal Baseball Club of Baltimore v. National League*, 259 U.S. 200, 208, 42 S.Ct. 465, 466, 66 L.Ed. 898 (1922), Mr. Justice Holmes said that "[t]he business is giving exhibitions of base ball, which are purely state affairs."

In *Toolson v. New York Yankees*, 346 U.S. 356, 356–57, 74 S.Ct. 78, 98 L.Ed. 64 (1953), the Court said in a short per curiam opinion:

> In *Federal Baseball Club of Baltimore v. National League of Professional Baseball Clubs*, . . . this Court held that *the business of providing public baseball games for profit between clubs of professional baseball players* was not within the scope of the federal antitrust laws. Congress has had the ruling under consideration but has not seen fit to bring *such business* under these laws by legislation having prospective effect. *The business has thus been left for thirty years to develop, on the understanding that it was not subject to existing antitrust legislation.* The present cases ask us to overrule the prior decision and, with retrospective effect, hold the legislation applicable. We think that if there are evils in this field which now warrant application to it of the antitrust laws it should be by legislation. Without re-examination of the underlying issues, the judgments below are affirmed on the authority of *Fed-*

*eral Baseball Club of Baltimore v. National League of Professional Baseball Clubs, supra,* so far as that decision determines that Congress had no intention of including *the business of baseball* within the scope of the federal antitrust laws. (Emphasis added).

In *Flood v. Kuhn*, 407 U.S. 258, 282, 284, 92 S.Ct. 2099, 2112, 32 L.Ed.2d 728 (1972), the Court said that "Professional baseball is a business and it is engaged in interstate commerce" and "we adhere once again to *Federal Baseball* and *Toolson* and to their application to professional baseball."

Finally, in holding that the antitrust laws do apply to "the business of professional football," the Supreme Court, speaking through Mr. Justice Clark, made a substantive pronouncement regarding the baseball cases in *Radovich v. National Football League*, 352 U.S. 445, 451, 77 S.Ct. 390, 394, 1 L.Ed.2d 456 (1957):

> . . . [S]ince *Toolson* and *Federal Baseball* are still cited as controlling authority in antitrust actions involving other fields of business, we now specifically limit the rule there established to the facts there involved, *i. e.*, the business of organized professional baseball.

 Despite the two references in the *Flood* case to the reserve system,[50] it appears clear from the entire opinions in the three baseball cases, as well as from *Radovich*, that the Supreme Court intended to exempt the business of baseball, not any particular facet of that business, from the federal antitrust laws.[51]

V

Following the bench trial, the district court reached its decision in favor of the Commissioner without considering the im-

---

**49.** *Flood v. Kuhn*, 407 U.S. 258, 259, fn. 1, 92 S.Ct. 2099, 2100, 32 L.Ed.2d 728 (1972). *See also* footnote 26 *supra.*

**50.** *See* footnote 48 *supra.*

**51.** We recognize that this exemption does not apply wholesale to all cases which may have

some attenuated relation to the business of baseball. *See, e. g., Twin City Sportservice, Inc. v. Charles O. Finley & Co.,* 365 F.Supp. 235 (N.D.Cal.1972), *rev'd on other grounds,* 512 F.2d 1264 (9th Cir. 1975).

pact of Article VII, Section 2 of the Major League Agreement, wherein the major league baseball clubs agreed to be bound by the Commissioner's decisions and discipline and to waive recourse to the courts.[52] In Parts II and III, we have affirmed the March 17, 1977, judgment, also without considering the impact of Article VII, Section 2. In this part we consider the district court's judgment of August 29, 1977, granting the Commissioner's counterclaim for a declaratory judgment that the waiver of recourse clause is valid and enforceable.

■ The Commissioner's counterclaim was based upon diversity of citizenship jurisdiction. In diversity cases a federal court must follow the conflict of laws principles prevailing in the state in which it sits. *Klaxon Company v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under Illinois conflict of law principles, the law of the place of performance governs the construction and obligations of the contract when the place of making and place of performance differ, if the agreement is to be wholly performed in one jurisdiction. If more than one place of performance is involved, the place of making of the contract governs its construction and obligations. *Oakes v. Chicago Fire Brick Co.,* 388 Ill. 474, 58 N.E.2d 460 (1944); *P. S. & E., Inc. v. Selastomer Detroit, Inc.,* 470 F.2d 125, 127 (7th Cir. 1972). The Major League Agreement was and is to be

performed in more than one state so that we are directed to its place of making.

The original agreement including Article VII, Section 2,[53] was made at Chicago, Illinois on January 12, 1921.[54]

Oakland has urged us to apply the substantive law dealing with the "policies and rules of a private association" to the Major League Agreement and actions taken thereunder.[55] Illinois has developed a considerable body of law dealing with the activities of private voluntary organizations [56] and we agree that the validity and effect of the waiver of recourse clause should initially be tested under these decisions.

■ Even in the absence of a waiver of recourse provision in an association charter, "[i]t is generally held that courts . . . will not intervene in questions involving the enforcement of bylaws and matters of discipline in voluntary associations." *American Federation of Technical Engineers v. La Jeunesse,* 63 Ill.2d 263, 347 N.E.2d 712, 715 (1976). In *La Jeunesse* the Illinois Supreme Court held that a private association could not bring suit to enforce fines imposed against some of its members. Thus the court upheld the rule that the courts are generally not available to an association or its members to review actions of a voluntary association with respect to its own members. *Accord, Engel v. Walsh,* 258 Ill. 98, 101 N.E. 222 (1913); *Werner v. International Association of Machinists,* 11 Ill. App.2d 258, 137 N.E.2d 100 (1956).

---

**52.** *See* footnote 14 *supra.*

**53.** In the original agreement it was Section 1 or Article VII. *See* footnote 14 *supra.*

**54.** The original agreement was to remain in force for 25 years (until January 12, 1946). Exs. K–3 and K–8. It was amended on December 12, 1944, February 3, 1945, November 1, 1946, August 1, 1960 and January 1, 1975. On February 3, 1945, the termination date was extended to January 1, 1970; on August 1, 1960, the date was extended to January 1, 1975; and on January 1, 1975, it was extended to January 1, 1980. Exs. B–49, B–50, K–1 and K–50.

**55.** Plaintiff's Brief, page 30. *See generally* Plaintiff's Brief, pages 28–38 and Plaintiff's Re-

ply Brief, pages 26–27. Concerning the law governing the activities of private associations, see *Judicial Control of Actions of Private Associations,* 76 Harv.L.Rev. 1011 (1967); *Judicial Annulment of Expulsion From Private Associations,* 60 Nw.U.L.Rev. 241 (1965).

**56.** *See, e. g., American Federation of Technical Engineers v. La Jeunesse,* 63 Ill.2d 263, 347 N.E.2d 712 (1976); *Van Daele v. Vinci,* 51 Ill.2d 389, 282 N.E.2d 728, *cert. denied,* 409 U.S. 1007, 93 S.Ct. 438, 34 L.Ed.2d 300 (1972); *Engel v. Walsh,* 258 Ill. 98, 101 N.E. 222 (1913); *Pacaud v. Waite,* 218 Ill. 138, 75 N.E. 779 (1905); *People v. Order of Foresters,* 162 Ill. 78, 44 N.E. 401 (1896); *Board of Trade v. Nelson,* 162 Ill. 431, 44 N.E. 743 (1896); *Rice v. Board of Trade,* 80 Ill. 134 (1875).

Viewed in light of these decisions, the waiver of recourse clause contested here seems to add little if anything to the common law nonreviewability of private association actions. This clause can be upheld as coinciding with the common law standard disallowing court interference. We view its inclusion in the Major League Agreement merely as a manifestation of the intent of the contracting parties to insulate from review decisions made by the Commissioner concerning the subject matter of actions taken in accordance with his grant of powers.[57]

A second situation in which the waiver of recourse clause must be tested is in conjunction with the provision immediately preceding it which provides that "[a]ll disputes and controversies related in any way to professional baseball between clubs . . shall be submitted to the Commissioner, as Arbitrator who, after hearing, shall have the sole and exclusive right to decide such disputes and controversies." Art. VII, Sec. 1. These clauses combine to place the Commissioner in the role of binding arbitrator *between disputing parties* as compared to his power to act upon his own initiative in the best interests of baseball as in the present case.

Considering the waiver of recourse clause in its function of requiring arbitration by the Commissioner, its validity cannot be seriously questioned. Illinois has adopted the Uniform Arbitration Act allowing contracting parties to require that all existing and future disputes be determined by arbitration.[58] Illinois is joined by numerous other states in encouraging a policy of arbitration, thereby providing private resolution of disputes and reducing litigation.[59] Moreover, it has been made clear that the United States Arbitration Act, 9 U.S.C. §§ 1–14, provides for arbitration of future disputes concerning contracts evidencing transactions in interstate commerce and that this federal law controls state law to the contrary. *Prime Paint v. Flood & Conklin,* 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967); *Erving v. Virginia Squires Basketball Club,* 468 F.2d 1064 (2d Cir. 1972). The federal courts have also upheld provisions in private agreements to waive all review of an arbitrator's decision. *Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974); *Rossi v. TWA,* 507 F.2d 404 (9th Cir. 1974), aff'g 350 F.Supp. 1263 (C.D.Cal.1972); *Euzzino v. London & Edinburg Insurance Co.,* 228 F.Supp. 431 (N.D.Ill.1964). We conclude that the waiver of recourse clause is valid when viewed as requiring binding arbitration by the Commissioner for disputes between clubs.

Even if the waiver of recourse clause is divorced from its setting in the charter of a private, voluntary association and even if its relationship with the arbitration clause in the agreement is ignored, we think that it is valid under the circumstances here involved. Oakland claims that such clauses are invalid as against public policy.[60] This is true, however, only under circumstances where the waiver of rights is not voluntary, knowing or intelligent, or was not freely negotiated by parties occupying

---

**57.** *See* Part II of this opinion for a discussion of the historical development and present extent of the Commissioner's powers.

**58.** Ill.Rev.Stat. ch. 10, § 101 *et seq.* Section 101 provides in part:

A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable . . .

. . . . .

**59.** At least twenty states have codified this policy by adopting the Uniform Arbitration Act. Adopting states include Alaska, Arizona, Arkansas, Colorado, Delaware, Idaho, Indiana, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Mexico, North Carolina, South Dakota, Texas and Wyoming.

**60.** *See, e. g., McCullough v. Clinch–Mitchell Const. Co.,* 71 F.2d 17 (8th Cir. 1934); *General Motors Acceptance Corp. v. Talbott,* 38 Idaho 13, 219 P. 1058 (1923) (in violation of state statute); *Progressive Finance and Realty Co. v. Stempel,* 231 Mo.App. 721, 95 S.W.2d 834 (1933) (arbitration of future disputes involved).

equal bargaining positions. The trend of cases in many states [61] and in the federal courts [62] supports the conclusion of the district court under the circumstances presented here that "informed parties, freely contracting, may waive their recourse to the court." [63]

▪ Although the waiver of recourse clause is generally valid for the reasons discussed above, we do not believe that it forecloses access to the courts under all circumstances. Thus, the general rule of nonreviewability which governs the actions of private associations is subject to exceptions 1) where the rules, regulations or judgments of the association are in contravention to the laws of the land or in disregard of the charter or bylaws of the associ-

ation [64] and 2) where the association has failed to follow the basic rudiments of due process of law.[65] Similar exceptions exist for avoiding the requirements of arbitration under the United States Arbitration Act.[66] We therefore hold that, absent the applicability of one of these narrow exceptions, the waiver of recourse clause contained in the Major League Agreement is valid and binding on the parties and the courts.

We affirm the district court's judgments of September 7, 1976, March 17, 1977 and August 29, 1977.[67]

AFFIRMED.

FAIRCHILD, Chief Judge, concurring.

rights is valid. Similarly, *Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972), upheld a private contractual agreement not to sue in any court other than the High Court of Justice in London. The Court declared that this choice "was made in an arm's-length negotiation by experienced and sophisticated businessmen, and absent some compelling and countervailing reason it should be honored by the parties and enforced by the courts." *Id.* at 12, 92 S.Ct. at 1914. Certainly this rationale applies to the instant case. *See also Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974), where the Court approved an agreement waiving review of an arbitrator's decision.

**61.** Waiver of recourse clauses rarely appear in the absence of an association charter or an agreement to arbitrate. Indeed, the waiver of recourse clause presented here must be viewed in light of the totality of circumstances presented, wherein private contractual recourse remedies are provided. For cases upholding waiver of recourse or similar clauses, *see Orkin Exterminating Co. v. Stevens,* 130 Ga.App. 363, 203 S.E.2d 587, 593 (1973) ("There is no generally applicable rule of law forbidding one contracting party from waiving all recourse in the event of breach by the other."); *Laub v. Genway Corp.,* 60 F.R.D. 462 (S.D.N.Y.1973) (Contractual agreement not to assert counterclaims valid in New York); *Kiewit Sons' Co. v. Iowa Southern Utilities Co.,* 355 F.Supp. 376 (S.D. Iowa 1973) ("No damage" clause will be regarded as valid and enforceable); *Seufert Land Co. v. Greenfield,* 262 Or. 83, 496 P.2d 197 (1972) (Waiver of all defenses in contract valid); *Park v. Board of Trustees,* 21 Cal.App.3d 630, 98 Cal.Rptr. 859 (1971) (Judicial review of pension plan board of trustees precluded); *Rossum v. Jones,* 97 N.J.Super. 382, 235 A.2d 206 (1967) (Covenant not to sue valid); *School District No. 46 v. Del Bianco,* 68 Ill.App.2d 145, 215 N.E.2d 25, 31 (1966) ("Arbitration—as settlements, releases and covenants not to sue— simply removes controversies from the area of litigation [and] . . . is looked upon with favor by federal state and common law.").

**62.** In *O. H. Overmyer v. Frick,* 405 U.S. 174, 184, 92 S.Ct. 775, 782, 31 L.Ed.2d 124 (1972), the Court upheld a cognovit note authorized by state law as constitutional under the Fourteenth Amendment where "a party gives up in advance his constitutional right to defend any suit by the other." The Court said that a voluntary, intelligent and knowing waiver of

**63.** Memorandum Opinion and Order of August 29, 1977, page 2.

**64.** *See, e. g., Ryan v. Cudahy,* 157 Ill. 108, 41 N.E. 760 (1895); *Allen v. Chicago Undertakers' Ass'n,* 137 Ill.App. 61 (1907), *aff'd,* 232 Ill. 458, 83 N.E. 952 (1908).

**65.** While "[s]trict adherence to judicial standards of due process would be arduous and might seriously impair the . . . proceedings of voluntary associations," *Van Daele v. Vinci,* 51 Ill.2d 389, 282 N.E.2d 728, 732 (1972), the procedure must not be a sham designed merely to give colorable propriety to an inadequate process. *Compare Virgin v. American College of Surgeons,* 42 Ill.App.2d 352, 192 N.E.2d 414 (1963) *with Parsons College v. North Central Ass'n of Colleges and Secondary Schools,* 271 F.Supp. 65 (N.D.Ill.1967).

**66.** 9 U.S.C. § 10.

**67.** Defendants-Appellees' Motion to Strike Plaintiff-Appellant's Reply Brief is denied.

Jurisdiction, both of the Finley claim that the actions of the Commissioner were not authorized by the Major League Agreement and of the Commissioner's counterclaim based on the waiver of recourse to the courts provision is predicated on diversity of citizenship. To the extent that this is a diversity action, the choice of law rules of the State of Illinois are controlling. Under Illinois choice of law decisions, the law of the place of formation governs where the contract is to be performed in more than one state. Because the contract was made in Illinois and performance is nationwide, Illinois law governs the contract issues: whether the actions of the Commissioner are authorized by the Agreement, and whether the waiver of recourse provision is valid.

With respect to whether the actions of the Commissioner were authorized by the Major League Agreement, the first question is whether the Agreement gives the Commissioner the power to void player assignments when no rules have been violated. This question, like the analogous question of determining when a grievance is arbitrable, requires a judicial interpretation of the contract. Two contractual bases exist for the Commissioner's action. Major League Rule 12(a) provides that no assignment of a player contract is valid until "approved by the Commissioner." More generally, Art. I, Sec. 2 of the Agreement states that the Commissioner shall have the power to investigate any act "suspected to be not in the best interests of . . . baseball" and to take whatever "preventative, remedial or punitive action is appropriate . . . ." Neither of these provisions in any way expressly limits the power of the Commissioner to situations involving rules violations. In my view, Finley has simply failed to establish that these provisions bestowing broad discretionary powers upon the Commissioner were intended by the parties only to apply in cases of rules violations.[1] Certainly the history carefully summarized in Judge Sprecher's opinion does not demonstrate that such a limitation was intended.

Once it is established that the Commissioner has the power under the contract to invalidate player assignments absent rules violations, the next problem is determining the standard of review applicable to the Commissioner's actions. Under Illinois law, this standard of review is extremely limited. In Illinois, courts will not as a general rule review the decisions of the governing body of a private association, e. g., *American Federation of Technical Engineers v. La Jeunesse*, 63 Ill.2d 263, 347 N.E.2d 712, 715 (1976); *Van Daele v. Vinci*, 51 Ill.2d 389, 282 N.E.2d 728, 731 (1972); *Engel v. Walsh*, 258 Ill. 98, 101 N.E. 222, 223 (1913). This is particularly true where, as here, the parties have voluntarily given the Commissioner such broad authority. The waiver of recourse to the courts provision strongly emphasizes the limited scope of judicial review intended by the parties of the Commissioner's actions. I agree with the suggestion in Judge Sprecher's opinion that the inclusion of the clause merely emphasizes the limited scope of review which would obtain in any event.

I would not, however, proceed with the majority to the more sweeping holding that the waiver of recourse to the courts provision, unless narrow exceptions exist, is "valid and binding on the parties and the courts" [presumably where Illinois law is found to control]. While the Illinois case law is sparse, the latest judicial pronouncement on the subject strongly suggests that

---

1. I do not agree with the majority, however, that it was not error for the district court to admit testimony of twenty-one of the parties to the Major League Agreement regarding their understanding concerning the authority of the Commissioner. The uncommunicated intentions and understandings of parties to a contract are inadmissible to establish their earlier intent at the time of contract formation. *E. g., Union Bank v. Winnebago Industries, Inc.*, 528 F.2d 95, 99 (9th Cir. 1975). I do not believe Finley was prejudiced by this error, however, in light of the unambiguous contractual language, the fact that the trial was held without a jury, and the judge's statement that he would give minimal weight to the testimony.

waiver of recourse to courts provisions are unenforceable and void in Illinois.[2]

While the scope of review of the Commissioner's decision is extremely narrow, I believe it could be overturned if Finley could establish that he was denied a fair hearing because the Commissioner was biased or motivated by malice. *Van Daele v. Vinci, supra,* 282 N.E.2d at 732. *La Jeunesse, supra,* 347 N.E.2d at 715, *Engel v. Walsh, supra,* 101 N.E. at 2. The district court, however, made express findings that Finley received a fair hearing and the Commissioner was not motivated by malice. The finding does not seem to me to be clearly erroneous. Such problems as there are with the finding arise out of comments by the court implying that malice of the Commissioner would be irrelevant, and the court's sustaining of objections to some of the questions concerning possible ill will. Notwithstanding the comments, the court did make the finding, and did hear some of the evidence. In the absence of an offer of proof it is hard to believe that the sustaining of the objections was prejudicial. Moreover, appellant had made no objection to the proceeding before the Commissioner on the ground of bias.

I concur in Part IV of the majority opinion holding that baseball's exemption from the antitrust laws is not limited to the reserve clause. I only add that *Federal Baseball Club of Baltimore v. National League,* 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898 (1922), the case establishing the exemption, did not involve the reserve clause. See discussion. *State v. Milwaukee Braves, Inc.,* 31 Wis.2d 699, 722–725, 144 N.W.2d 1 (1966), *cert. denied sub nom. Wisconsin v. Milwaukee Braves, Inc.,* 385 U.S. 990, 87 S.Ct. 598, 17 L.Ed.2d 451.

TONE, Circuit Judge, concurring.

With respect to the testimony of the 21 owners as to their understanding of the meaning of the Major League Agreement, I read Judge Sprecher's opinion as holding that testimony admissible on the issue of notice, not on the issue of their intent at the time of contract formation. The uncommunicated intent of a party to a contract is not admissible on the issue of the meaning of the contract. (See, in addition to the *Union Bank* case cited by Judge Fairchild, Judge Learned Hand's statement in *Hotchkiss v. National City Bank,* 200 F. 287, 293–294 (S.D.N.Y.1911), *aff'd* 201 F. 664 (2d Cir. 1911).) Here, however, appellant argues that the Commissioner's action was an "abrupt departure from well established assignment practice and his retroactive application of the change of policy to disapprove appellant's assignments was made without reasonable notice and was therefore procedurally unfair"; and that "the reasonable expectations of a member of a private association may not be denied by a retroactive ruling lacking reasonable notice." It is to be remembered that

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Rule 401, Fed.R.Evid. The understanding of the other owners over a period of many years concerning the Commissioner's authority tended to make less probable the alleged facts on which appellant based the argument of lack of reasonable notice, *viz.,* the existence of the asserted "well established assignment practice" that was changed contrary to appellant's "reasonable expectations." There was other, more pro-

---

**2.** In *In re Streck's Estate,* 35 Ill.App. 473, 183 N.E.2d 31 (1962), the court stated:

Agreements whose object is to oust the jurisdiction of the courts are contrary to public policy and void.

The one Illinois case cited by the majority in support of its upholding the waiver of recourse to the courts provision, *School District No. 46*

*v. Del Bianco,* 68 Ill.App.2d 145, 215 N.E.2d 25 (1966), involved a contract for arbitration. Public policy in that area had been pronounced by the legislature in the Uniform Arbitration Act. The Act does not completely foreclose recourse to the courts, since fraud and the grounds for vacating an award are recognized.

bative evidence, including actual exercises of authority inconsistent with the asserted practice and conduct of appellant's president indicating an opinion consistent with that of the 21 other owners, that made the challenged evidence cumulative but not inadmissible unless the judge exercised his discretion under Rule 403, Fed.R.Evid., to exclude it.

Because the evidence was admissible on the notice issue, error could lie only in considering it on the interpretation issue, on which it was not admissible. Any such error was harmless, because neither the district judge's interpretation of the agreement nor ours depends upon the challenged evidence.